**Jeff Dominic Price  |** SBN 165534
1311 Broadway
Santa Monica, California 90404
jeff.price@icloud.com
Tel. 310.451.2222

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J. N., | No. CV-14-02428-DDP(PLAx) |
| Plaintiff, | THIRD AMENDED COMPLAINT |
| vs. | 1.  42 U.S.C. § 1983; Unlawful Search and Seizure – Judicial Deception |
| DETECTIVE HEATHER M. HENDRICKSON #429, ANNE MARIE SCHUBERT, RICK BRAZIEL, DETECTIVE J. LEROSE #773, SGT. DUBKE, SACRAMENTO POLICE DEPARTMENT, CITY OF SACRAMENTO, and TEN UNKNOWN NAMED DEFENDANTS ["ROES" 1-10], inclusive, | 2.  42 U.S.C. § 1983; Malicious Prosecution |
| | 3.  42 U.S.C. § 1983 Fabrication of Evidence; |
| | 4.  42 U.S.C. § 1983 Suppression of Exculpatory Evidence; |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

I.

JURISDICTION AND VENUE

1.     This action is brought by Plaintiff J. N. for redress for deprivations of constitutional rights under 42 U.S.C. § 1983 *et seq.* and the jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

2.     Plaintiff was within this district and within the jurisdiction of the United States of America at times herein alleged (thus making venue in this district is proper according to 28 U.S.C. § 1391(b).

II.

INTRODUCTION

3.     This case arises from an investigation, arrest, incarceration and prosecution of plaintiff J. N. for crimes – crimes of a particularly odious nature

involving the exploitation of children – that he did not commit, but that were committed by other people whom the defendants failed to interdict, and, who, as a consequence of the defendants' deliberate indifference to the policy and training deficiencies of the Sacramento Police Department that caused the deprivations of the constitutional rights of the plaintiff here, are free to continue to exploit and victimize children. Thus, the defendants, by their actions in unlawfully arresting and incarcerating plaintiff, actually are accessories to the perpetration of heinous crimes against children. As a result of the acts and omissions of the defendants plaintiff was incarcerated for more than seven months, labeled as a child molester, suffering from constant danger of being killed in jail because of his being branded a child molester, severely magnifying the difficulty and danger experienced on each day of the almost eight months that he spent in jail.

4.    In late March 2011 the Sacramento Police Department received a report from Nicole W. that her 12 year-old daughter K. W. had come into contact with at least two predatory pedophiles in an Internet chat room, that these predators had exposed their genitals to her daughter, engaged in sexual conduct while her daughter was online, and had solicited sexual intercourse with her daughter. On or about March 31, 2011, defendant Hendrickson took over the investigation and after learning the nickname of one of the predators, put together a six-pack with plaintiff's photograph and presented the six-pack to K. W. Though K. W. did not identify plaintiff and though Hendrickson failed to conduct further investigation into the identity of the predator, she sought a search warrant for plaintiff's residence, put together and signed a search warrant affidavit, presented the search warrant affidavit to a state court judge, and obtained a search warrant for plaintiff's residence in Los Angeles. After searching plaintiff's residence and obtaining no evidence or probable cause linking plaintiff with the crimes reported by Nicole W. and K. W., defendants Hendrickson and LeRose arrested and incarcerated plaintiff, and prosecuted plaintiff

1   without probable cause for six months until the case was dismissed on motion of the

2   prosecution. The defendants also suppressed exculpatory evidence by failing to

3   disclose it to the prosecution, which prolonged the malicious prosecution of plaintiff

4   because plaintiff's counsel was unaware of the existence of such evidence and

5   unable to present arguments that could have led to the earlier termination of the

6   prosecution.

7                                                III.

8                                           PARTIES

9          5.      Plaintiff J. N., who makes this complaint, was within this district and

10  within the jurisdiction of the United States of America at all times herein alleged

11  (thus making venue in this district is proper according to 28 U.S.C. § 1391(b)).

12         6.      Plaintiff files this action anonymously because of the extreme obloquy

13  and danger associated with being accused of having committed the type of crime

14  that plaintiff was maliciously, unreasonably, recklessly and falsely accused of

15  committing, and to mitigate further damage to plaintiff.

16         7.      Defendants, including but not limited to Rick Braziel ["BRAZIEL"],

17  Detective Heather M. Hendrickson ["HENDRICKSON"], Detective J. LeRose

18  ["LEROSE"] and Sgt. Dubke ["DUBKE"], a supervisor, were employed by the City

19  of Sacramento within the Sacramento Police Department [SPD].

20         8.      Unknown defendants include the Sergeants of the SPD divisions in

21  which the individual defendants were employed and other supervising officers, who

22  may be policymakers, supervisors or persons responsible for training and discipline

23  of officers in the field.

24         9.      Defendant BRAZIEL was at all material times a California police

25  officer employed by the City of Sacramento as Chief of Police and the legal head

26  and policymaker for the Sacramento Police Department at all times during which

27  time incidents occurred resulting in the deprivation of Plaintiff's constitutional

28

                                                                    CV-14-02428-DDP(PLAx)

**3 - THIRD AMENDED COMPLAINT**

rights, which are collectively and/or individually referred to herein as the INCIDENT. BRAZIEL was also a supervisory defendant.

10. Defendant ANNE MARIE SCHUBERT was at all times employed as a Deputy District Attorney for the County of Sacramento assigned to investigate allegations that plaintiff committed the crimes set forth in the criminal complaint, including violations of Penal Code §§ 288(a), 288.2(a) and 288.3.

11. Defendant Sgt. Dubke was at all material times a supervisor of the individual police officers involved in the seizure and prosecution of Plaintiff J. N.

12. The Sacramento Police Department and the City of Sacramento are governmental entities.

13. Defendants City of Sacramento and Sacramento Police Department were at all times alleged herein an unincorporated association and or a California governmental entity charged with and responsible for appointing and promoting, the employees of the City of Sacramento, and for the supervision, training, instruction, discipline, control and conduct of said employees. At all times alleged herein defendant SPD had the power, right and duty to control the manner in which the individual defendants carried out the objectives of their employment and to assure that all orders, rules, instructions, and regulations promulgated were consistent with the United States Constitution, the California Constitution, the laws of the United States, the laws of the State of California, and the laws of the municipality.

14. The unknown named defendants ["Doe" defendants] include but are not limited to, unknown named Sergeants, Lieutenants and Captains who acquiesced in the false arrest and malicious prosecution of Plaintiff J. N., as is described below, and unknown named employees of the City of Sacramento and the SPD who were policymakers who created, fostered, acquiesced, ratified and/or maintained the policies, customs and/or practices that caused the deprivation of Plaintiff J. N.'s constitutional rights.

15. Plaintiff is ignorant of the true names and capacities of those defendants named as Unknown Named Defendants or "Does" and will amend this complaint to allege the true names and capacities of said defendants when they become known.

16. Each and every defendant who is a natural person is sued in both his/her individual/personal capacity, as well as in his/her official capacity and/or supervisory capacity if he/she had any policymaking or supervisory duties, functions, or responsibilities with respect to the matters alleged.

## IV.

## GENERAL ALLEGATIONS

17. Each of the defendants was the agent and/or employee and/or co-conspirator of each of the remaining defendants, and in doing the things alleged here, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-defendants.

18. Each paragraph of this complaint is expressly incorporated into each claim for relief which is a part of this complaint.

19. The acts and omissions of all defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of plaintiff and with knowledge that the conduct violated well and clearly established and settled law.

## V.

## FACTUAL ALLEGATIONS

20. Plaintiff J. N. previously was deprived of interests protected by the Constitution and/or laws of the United States of America, and each and every defendant caused, by commission or omission, such deprivation while acting under color of law.

21. The series of events and circumstances that occurred on or about

August 17, 2011, when plaintiff was arrested, and before and thereafter, as more fully described in this pleading may be referred to as the incident.

22.     The allegations in the following paragraphs, ¶¶ 26-53, are taken from the search warrant affidavit executed by defendant Hendrickson in SPD Case No. 11-90844.

23.     Based upon the search warrant affidavit, in which she asserted that the facts she set forth under oath in the affidavit showed that sexual exploitation of a child in violation of California Penal Code § 311.3 and depiction of sexual conduct of a person under the age of 18 years in violation of Penal Code § 311.11 had been committed and that the affidavit provided probable cause to believe that the objects of the search warrant would show that such crimes had been committed, defendant Hendrickson sought a search warrant for all stored electronic communications, including email, digital images, buddy lists, friend lists, and any other files associated with user accounts identified as: Facebook ID "www.facebook.com/PaterNiki" and "katie_baby75@yahoo.com," including all connection logs and records of user activity for these accounts, including IP logs, disconnect dates and times, email messages, private messages in the user Inbox, Trash and Sent Mail, comments, data related to the account including account setup information (name, address, phone number etc.), associated email addresses, user names associated with the connections, and Internet Protocol addresses and sources, billing records, records of contact by any person or entity regarding these accounts/user names and any other subscriber information.

24.     Based upon the search warrant affidavit defendant Hendrickson sought a search warrant for information pertaining to the other computers to which the users of these accounts connected, by any means, during the connection period, including destination IP address, connection times and dates, disconnect times and dates, method of connection to the destination computer, and all other information

1    related to the connection.

2        25.    Based in part on the information prepared by defendant Hendrickson in

3    support of the search warrant affidavit, specifically, a 6-page report, which

4    contained materially false information and material omissions, as is more fully set

5    forth below, defendant Schubert signed an arrest warrant declaration and presented

6    the declaration to the Superior Court, causing the Superior Court to issue a warrant

7    for the arrest of plaintiff.

8        26.    On 3-26-11, reporting party [R/P] Nicole W. contacted the Sacramento

9    Police Department to report (SPD Case #11-90844) that at least two adult males had

10   been contacting her 12 year old daughter, Katelynn W. [K. W.], through Facebook

11   and other social media sites and that the suspects had solicited her to commit sex

12   acts, allow them to her see her body clothed and unclothed and to watch them

13   perform sex acts, all while on web camera.

14       27.    R/P Nicole W. reported that she found messages from these two males

15   identified as "Pater Noster" and "Alex James" on their Facebook profiles, to her

16   daughter K. W. R/P Nicole W. advised that she lived at **** Seyferth Way, located

17   in the City and County of Sacramento.

18       28.    On 03-31-11, defendant Hendrickson was assigned this case for follow-

19   up. R/P Nicole W. had taken her daughter's laptop away and had not allowed her to

20   access the computer, in order to preserve any digital or computer evidence. She

21   provided defendant Hendrickson with the computer, as well as the login information

22   for her daughter's computer and social media accounts.

23       29.    R/P Nicole W. advised that she had gone onto her daughter's

24   computer to use the Internet Explorer and had seen that her daughter's Facebook

25   account was still logged on.  When she checked her daughter's messages, she

26   had seen several from the above two males, including messages similar to:

27       "I enjoy seeing your breasts"

28

1    "Can you put your fingers in your pussy?"

2    "Did you enjoy watching me jack off?"

3    "When can we meet again?"

4    30.    Most of the messages had been deleted prior to defendant

5 Hendrickson's viewing the computer.  However, when defendant Hendrickson

6 accessed the computer, she saw that one of the males, "Pater Noster" had left

7 messages in K. W.'s inbox including:

8    **Subject:**  None

9    **Date:**  3/20/2011  1:58 PM

10    Ughhh wat did u doo??

11

12    **Subject:**  None

13    **Date:**  3/20/2011  1:59 PM

14    NOOOOOOOOOO

15

16    **Subject:**  None

17    **Date:**  3/20/2011  6:18 PM

18    katie u cant be serious bout unfriending me again :// c'mon u didnt say

19    anything...how shud i know?  u know i love u sooo much <33333

20

21    **Subject:**  None

22    **Date:**  3/26/2011  11:48 AM

23    I DOOO love you K****!!! I thought u liked it and u didn't say anything i

24 shud stop...I

25 love you, pls don't be mad at me I miss you so much <3333.

26    31.    R/P Nicole W. advised that she had talked to her daughter about the

27 messages and that her daughter had finally told her that the two males had contacted

28

her in "Tiny Chats", a sidebar video chat associated with Facebook and that they had been showing her sexual acts, asking her to show her naked breasts and body, and perform sexual acts in front of the camera.

32.     Defendant Hendrickson conducted an Internet search of the name "Pater Noster" and found that it is Latin for "Our Father." She ran a last name through the CalPhoto Mugshot system and located one subject. When defendant Hendrickson ran a records/warrants check on the subject, she located a criminal history listing one of the subject's alleged AKAs. Defendant Hendrickson conducted an internet search on a name with that DOB, and located photographs and news articles, including an article which purportedly reported that the subject (plaintiff J. N.) had been arrested. Included in the photos was a picture of the subject. Defendant Hendrickson compared that picture to the most current DMV picture for the subject, and concluded that they appeared to be of the same person.

33.     Defendant Hendrickson assembled a "six pack" photo line-up in Cal-Photo, using plaintiff's most current picture (DMV, dated 2008).

34.     On 03-31-11, defendant Hendrickson interviewed K. W. She advised that she met Suspects "Pater Noster" and Alex J. in a chat room called "Tiny Chats" which is associated with Facebook.

35.     In "Tiny Chats", multiple people are on their web cameras and chat with others.  K. W. stated that people can "private chat," where they can have a video chat with another person privately. K. W. stated that both suspects had requested private chats with her after chatting with her in "Tiny Chats".

36.     K. W. stated that suspect Alex J. had been the one to ask her to put her fingers inside her vagina, and that he had sent her pictures of his genitalia via text, erect and during masturbation. Suspect Alex J. had also asked her to send pictures of her genitalia, with her fingers in her vagina and pictures of her "boobs".  K. W. advised that both suspects had chatted normally with her at first.  However, after

several chats, the tone had changed.

37.    K. W. stated that suspect Pater Noster had asked to see her "boobs" first with her bra on and then with her bra off.  He also asked to see her body and her "butt".  She stated that this occurred within a short time after she started chatting with him.  K. W. stated that she had shown him her naked "boobs" but that she had only shown him her "butt" and her body with her clothing on. After that, she stated that every time they chatted, several times a week, he asked to see her body or her "boobs". She thought that she had showed him her naked boobs at least 4-5 times.

38.    During one of those chats, a few weeks after she started going to the private chat rooms with Pater Noster, she stated that he had taken her to the private chat room and that when it came up on her screen, his genitals including his penis were exposed. She stated that he was playing with himself and that his penis was "long and thicker." She stated that he played with himself until he "came" (ejaculated), cleaned himself with a towel and then showed it to her.

39.    K. W. stated that Pater Noster masturbated on camera for her several more times during further chats. She stated that she wouldn't watch until he "came" each time though and would click out of the window.

40.    Pater Noster would send K. W. messages telling her that he wanted to "come so bad" and that he wanted to "come" on her, if she liked what he was doing and what she saw.

41.    K. W. stated she identified herself as a 13 year old girl to Pater Noster. She stated that he identified himself as being in his 30's, but that she thought that his age was closer to 45 years old.  She also stated that Pater Noster had about 100 Facebook friends, but that his top friends were all really young looking girls. K. W. advised that she had "unfriended" him because he had started getting really aggressive, sending multiple messages about how beautiful she was and how he wanted to "come" on her, asking her why she didn't watch all the way through

anymore.

42.    Defendant Hendrickson wrote in a search warrant affidavit that she asked K. W. if she would be able recognize Pater Noster if she saw him again and that K. W. stated that she would. Defendant Hendrickson wrote in a search warrant affidavit that she showed K. W. a Photo Line-up Admonishment and showed K. W. the line-up and that K. W. stated that #3 (which contained a photograph of plaintiff J. N.) looked like the person she knew as "Pater" but that "Pater" was heavier and wore glasses.

43.    K. W. stated that the contact with the two suspects had started shortly after she received a laptop computer as a gift for Christmas, but she was unsure exactly when. Defendant Hendrickson initiated a forensic evidence search of the laptop computer.

44.    Since K. W. confirmed that multiple pictures of her body had been sent to suspect Alex J., at his direction and with his instructions as to specific pictures, Defendant Hendrickson contacted the FBI Child Exploitation Unit in Sacramento. Special Agent Scott Schofield stated that he would be investigating the case involving Suspect James. SA Schofield put Defendant Hendrickson in contact with Officers Solis and Noggle with the Los Angeles Police Department's Internet Crimes Against Children Federal Task Force.

45.    Defendant Hendrickson confirmed with Officers Noggle and Solis that their task force would be able to assist with the service of a search warrant at plaintiff J. N.'s residence.  Officer Solis went to plaintiff's residence to obtain the description for the search warrant.

46.    Defendant Hendrickson conducted checks in Accurint to attempt to locate a current address for plaintiff J. N. and located an address in Los Angeles, California, which appeared to be the most current.

47.    On 04-06-11, at approximately 1430 hours, Defendant Hendrickson

contacted the Los Angeles Department of Power and Water and spoke with investigator J. R. White. Defendant Hendrickson requested address verification for the Los Angeles address and Mr. White confirmed that plaintiff J. N. lived at that address.

48. On 04-11-11, after receiving consent from R/P Nicole W., Defendant Hendrickson signed onto K. W.'s Facebook account (Katie_baby75@yahoo.com) and changed the password. Defendant Hendrickson viewed Pater Noster's Facebook page (www.facebook.com/PaterNiki). Pater Noster appeared at that time to have almost 100 "friends" on Facebook. The profile pictures for the vast majority of the "friends" appeared to be very young pre-teen to teenage girls.

49. Defendant Hendrickson re-"friended" Suspect Noster, with the intention of sending messages to him posing as Victim Wray. Within a few minutes, Suspect Noster instant-messaged (IM'd) Victim W.'s account. The following are excerpts from the messages back and forth.

"Pater Noster":     awwwwwwwww

                    AAWWWWWWWWWW

                    (10 lines of pink hearts)

                    I MISSED YOU SOOOOOO MUCH!!!!!!!!!!!

                    U almost killed me

"K. W.":            why?

"Pater Noster":     withdrawl of affection

                    and it was so out of the blue I cudnt even do or say anything

                    I was really desperate

*(later in the conversation)*

"Pater Noster":     wow I really can feel I love u

                    Its soo warm inside my tummy now

| | | |
|---|---|---|
| 1 | "K. W.": | why |
| 2 | "Pater Noster": | cos I love you  maybe u will have this feeling once too |
| 3 | my iceprincess | |
| 4 | "K. W.": | why is ur tummy warm |
| 5 | "Pater Noster": | u never had a crush on someone?  Its cribbling and |
| 6 | | warm inside |
| 7 | *(a few messages later)* | |
| 8 | "Pater Noster": | ur soo my ideal girl |
| 9 | "K. W.": | how come? |
| 10 | "Pater Noster": | idk exactly   ur a mixture of all things i love    great |
| 11 | body, | |
| 12 | | very cute face |
| 13 | | a bit slow      lush  ;)  southern actually |
| 14 | "K. W.": | lush?  I dont know wat that means |
| 15 | "Pater Noster": | that's wat i always called u haha, cant you remember? |
| 16 | | Like amply, lavish, opulently luxuriantly   flamboyant |
| 17 | | Haha   if you don't get it no matter, its really good tho |
| 18 | | and a big compliment  8) |
| 19 | "K. W.": | gotta go..moms home….talk 2 u 2morrow? |
| 20 | "Pater Noster": | ok 8))  I love you   looking forward to it 8)) |

21    50.    On 04-12-11, at approximately 1626 hours, defendant Hendrickson

22  logged into K. W.'s Facebook account. Pater Noster was not signed on at that

23  time. Defendant Hendrickson sent him the following message and then logged

24  off:

25    **Subject:** None

26    **Date:** 4/12/2011  14:26 PM

27    sorry I was gone mom wouldn't let me on the computer.  8(

28

1    Defendant Hendrickson later received the following message from Pater
2  Noster:

3    **Subject:** None

4    **Date:** 4/12/2011  4:45 PM

5    Ohhh thats sad baby ;?

6    i waited for u my loveliest of all (heart)

7    cant really describe my feelings for u but I wana cuddle and things with
8  you all day long hahah I love you, c u tomorrow then 8) (heart)

9    51.    Defendant Hendrickson also stated in the search warrant affidavit and it
10  is alleged that she had been employed by the SPD for more than 10 years working
11  on sexual assault, child pornography and child abuse/sexual abuse cases and a
12  variety of other criminal cases, that she served as a field training officer training
13  new police officers, that she had worked as a decoy prostitute picking up "Johns",
14  that she has spoken to victims, witnesses and perpetrators of crimes about how
15  crimes were perpetrated and how evidence was concealed and/or disposed of, that
16  she had spoken with more experienced officers who have explained to her the
17  modus operandi of suspects in the type of crimes that was the subject of the K. W.
18  investigation, that she was promoted to Detective in January 2007, in which position
19  she, *inter alia*, assisted in the execution of search warrants, attended 80 hours of
20  training in crime scene investigation, including search warrant preparation and
21  courtroom testimony, that in January 2011 she was assigned to the Sexual
22  Assault/Child Abuse Unit (SACA), that in February 2011 she attended a 40-hour
23  course that included instruction in the investigation of child abuse, sexual abuse and
24  child exploitation, and that in April 2011 she attended a child abduction training
25  course.

26    52.    Defendant Hendrickson wrote in the search warrant affidavit that she
27  had acquired the following knowledge:

28

- There are persons whose sexual objects are children. They receive sexual gratification and satisfaction from actual physical contact with children and from fantasy involving use of pictures, other photographic or art mediums, and writings on or about sexual activity with children.

- These people collect sexually explicit materials consisting of photographs, magazines, motion pictures, videos, books, diskettes, and slides depicting juveniles, which they use for their own sexual gratification and fantasy.

- These people use sexually explicit materials, including those listed above, for lowering the inhibitions of children, sexually stimulating children and themselves, and for demonstrating the desired sexual acts before, during, and after sexual activity with children. These people often correspond or meet with one another to share information and identities of their victims as a means of gaining status, trust, acceptance, and psychological support.

- These people rarely destroy correspondence received from other people with similar interests unless they are specifically requested to do so.

- The majority of these people prefer contact with children of one sex and treat materials featuring the preferred sex as prized possessions.

- These people engage in activities or gravitate to programs which will be of interest to the type of victim they desire to attract and will provide them with access to these children.

- These people use such photos and videos as described above as a means of reliving fantasies or actual encounters with the depicted children. They also utilize the photos as keepsakes and as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading, or selling them to other people with similar interests. These photos are carried and kept by these people as a constant threat to the child as blackmail and/or exposure.

CV-14-02428-DDP(PLAx)

- These people are afraid of discovery and often maintain and run their own photographic production and reproduction equipment.  This may be as simple as the use of "instant" photo equipment, such as digital cameras, Polaroid equipment, video equipment, photo color quality printers, or a completely outfitted photo lab.

- These people go to great lengths to conceal and protect from discovery, theft, and damage, their collections of illicit materials.  This often includes the rental or use of safe deposit boxes or other storage facilities outside their immediate residence.

- These people often collect, read, copy or maintain names, addresses, phone numbers, screen names, or lists of persons who have similar sexual interests.  These may have been collected by personal contact, and/or Internet contact, or through advertisements in various publications.  These contacts are maintained as a way of personal referral, exchange, and commercial profit.  These people often correspond with others with the same interests through the use of computerized bulletin boards and "chat rooms."  These names may be maintained in the original publication, in phone-books, notebooks, or in computer hard drives, floppy disks, software or merely on scraps of paper. These people often keep the names of children they are involved with or with whom they have had sexual contact.  They maintain these names in much the same manner as described in the preceding paragraph for many of the same reasons.

- These people maintain diaries of their sexual encounters with children.  These accounts of their sexual experiences are used as a means of reliving the encounter when the offender has no children to molest.  Such diaries might consist of a notebook, scraps of paper, or a formal diary.  Depending upon the resources available to the offender, they may be

contained on audiotape or computer entries into a home computer.

- These people cut pictures of children out of magazines, newspapers, books, and other publications that they use as a means of fantasy relationships. These "cutouts" help to identify the age and sexual preference of the person under investigation.

- These people collect books, magazines, newspapers, computerized visual images, and other writings on the subject of sexual activities with children. They maintain these as a way of understanding their own feelings toward children.

- These people use sexual aids, such as dildos, fashioned after a man's penis, of various sizes and shapes, in addition to other sexual aids in the seduction of their victims. They often use these as a means of exciting their victims and as a method for arousing the curiosity of the children.

- These people collect and maintain books, magazines, articles, and other writings on the subject of sexual activity. These books and materials may be on the topics of human sexuality and sexual education or consist of sexual manuals discussing or showing various sexual acts, positions, or sexual activities.

- These people often use drugs as a means of inducement to get a child to a particular location such as the offender's home. Alcohol is also used in this fashion. Both drugs and alcohol are also used as a means of seduction and for reducing the child's inhibitions for sexual excitement.

- These people often collect and maintain artifacts, statues, paintings, or other media that depict children or young persons in nude poses or sexual acts. These are kept or "left" in places where the victims can find or "discover" them. These people obtain and keep things of interest to their victims. They may consist of magazines, books, and toys for the age level

CV-14-02428-DDP(PLAx)

of the victims they desire to attract and may be as complicated as video games, video game systems, and computers.

- These people often keep mementoes of their relationships with specific children as a means of remembrance.  These may consist of underwear or other garments or things that are unique to the relationship they had with the child.

- These people obtain, collect, and maintain photographs of children they have been involved with.  These photographs may depict children fully clothed, in various stages of undress, or totally nude, in various activities, not necessarily sexually explicit.  These photos are rarely, if ever, disposed of and are revered with such  devotion that they are often kept upon the individual's person, in wallets and on diskettes.  If a picture of a child is taken by such a person, depicting the child in the nude, there is a high probability the child was molested before, during, or after the photo taking session because the act of posing the child is a great sexual stimulus for the individual.

- All of the materials requested for seizure may identify children who are being sexually exploited through child molestation and child pornography. The materials may also identify other adults who are engaged in the sexual exploitation of children by these means. In addition, these materials may demonstrate the sexual proclivity, inclination, preference, and activities of the person under investigation, providing evidence that may tend to show that the person under investigation has committed felonies, to wit Penal Code sections 664/288(a), 311.1, and 288.2.

53.     In the search warrant affidavit defendant Hendrickson asserted that: "Based on [K.] W.'s statement that Suspect Noster has displayed his genitals and

masturbated on video, that he was told that she was 13 years old, the multiple requests to see her breasts and her body, of which she showed her naked breasts, the messages seen by R/P [Nicole] W., and the correspondence between Suspect Noster and myself, who he believed to be [K.] W., I believe that evidence will be located during a search of Suspect Noster and [K.] W.'s Facebook records.  Based on the chats that I have conducted, the messages that I located during the search of Victim W.'s Facebook page, and her statement that the correspondence occurred through Facebook and through "Tiny Chat, I believe there is sufficient probable cause to believe that that crime of 288.2 PC – Distribution or Exhibition of Lewd Material to a Minor, 288.3 PC – Contacting a Minor with the Intent to Commit Certain Offenses and 311.11 – Possession or Control of Matter Depicting Sexual Conduct of Person under Age 18 has occurred and that information obtained as a result of this warrant will assist in the investigation of the crime."

54.    K. W. told defendant Hendrickson that during one of the chats Pater Noster told K. W. that he lived in England.

55.    Defendant Hendrickson ran the name "N*****" through the CalPhoto Mugshot system and located one subject with the last name "N*****", plaintiff; defendant Hendrickson subsequently supplanted the name "Pater Noster" with plaintiff's name in her reports.

56.    On or about March 31, 2011, defendant Hendrickson assembled a six-pack photo array with plaintiff's photograph in position three (#3); the photo array was suggestive in violation of the due process clause of the Constitution of the United States because the plaintiff was the only person of the six persons photographed wearing a white shirt.

57.    On March 31, 2011, defendant Hendrickson interviewed K. W. on videotape.

58.    On March 31, 2011, defendant Hendrickson presented K. W. with a

photographic line-up admonition form but directed K. W. to sign the form before she read the form and K. W. signed the form before she read it.

59.     On March 31, 2011, defendant Hendrickson told K. W. that she found a picture of the guy that "we think might be the person" immediately before she showed the six-pack photo array to K. W. and K. W. did not identify plaintiff as being Pater Noster.

60.     On March 31, 2011, defendant Hendrickson showed the six-pack to K. W. and K. W. pointed to #3, the photograph of plaintiff and stated "he is too skinny – the guy that I saw was much chunkier"; after looking at the photographs for a few more seconds, K. W. again pointed to photograph #3 and stated that "that kind of looks like him," after which defendant Hendrickson directed K. W. to circle #3, which she did.

61.     Defendant Hendrickson made a false statement under oath in the search warrant affidavit when she wrote that K. W. stated that #3 (which contained a photograph of plaintiff) looked like Pater Noster.

62.     Defendant Hendrickson made a false statement under oath when she omitted from the search warrant affidavit that K. W. stated that #3 "is too skinny . . . ."

63.     On or about April 19, 2011, defendant Hendrickson wrote a search warrant affidavit and search warrant for the search of K. W.'s online account and Pater Noster's Facebook account.

64.     Defendant Hendrickson stated falsely in an SPD report that plaintiff "still referred to himself" as "Pater Noster."

65.     Defendant Hendrickson stated falsely in an SPD report that K. W. referred to the person she knew as Paternoster as "Noster."

66.     During the period of time that K. W. was allegedly victimized as described above Plaintiff had not set up, nor was he using, a Facebook account.

67.    Before applying for a search warrant for plaintiff's residence defendant Hendrickson knew or had reason to know that plaintiff had not set up, nor was he using, a Facebook account during the period of time that K. W. was allegedly victimized.

68.    On or about August 15, 2011, and as a result of the actions of defendants, a seven count criminal complaint was filed against the Plaintiff in the Superior Court, State of California, County of Sacramento, wrongfully alleging violations and charging plaintiff with violations of California Penal Code §§ 288(a), 288.2(a), and 288.3.

69.    On or about August 15, 2011, defendant Anne Marie Schubert executed a Declaration in Support of Arrest Warrant in which she declared under penalty of perjury that pursuant to her employment as a Deputy District Attorney for the County of Sacramento she had "been assigned to investigate allegations that [plaintiff J. N.] did commit the crime(s) as set forth in the attached complaint" and that she had contacted persons having knowledge of said offenses and who prepared written reports and/or statements, and/or had received and read written reports and/or statements prepared by others known by her to be law enforcement officers, all of which reports and/or statements are included in a report consisting of 6 pages attached to the declaration as Exhibit I and incorporated by reference thereto.

70.    Defendant Schubert presented this declaration to the Superior Court of the State of California and, as a result, on August 15, 2011, a Superior Court judge issued a warrant for the arrest of plaintiff.

71.    The six-page report written by defendant Hendrickson, which was attached as an exhibit to defendant Schubert's declaration contained false statements and misrepresentations, including: (1) defendant Hendrickson stated that on April 11, 2011, she "viewed [plaintiff's] Facebook page"; (2) defendant Hendrickson stated that plaintiff appeared at that time to have almost 100 "friends" on Facebook

and that the profile pictures of the vast majority of the "friends" appeared to be very young pre-teen to teenage girls; (3) defendant Hendrickson stated that, using K. W.'s Facebook account, she refriended plaintiff J. N. and that within a few minutes plaintiff instant-messaged K. W.'s Facebook account; (4) defendant Hendrickson then stated in the police report that plaintiff engaged in a lengthy exchange with Hendrickson, who was logged on as K. W.; (5) defendant Hendrickson stated in the six-page police report that on April 12, 2011, she logged into K. W.'s Facebook account and that "[plaintiff] was not signed on at that time" and that she sent plaintiff a message and that she later received a message, which she quoted and which contains the same type of language that she claimed was used by plaintiff, in response to the April 12, 2011, message.

72.     Defendant Dubke reviewed the six-page report, in addition to the reports and information accompanying the search warrant affidavit, and specifically approved them, despite the fact that he knew, or reasonably should have known, that the reports and affidavits prepared by defendant Hendrickson contained materially false information and material omissions, such that, in the absence of which, probable cause to search plaintiff's residence and person and probable cause to arrest plaintiff would have been lacking, but defendant Dubke failed to act to prevent defendant Hendrickson from engaging in the conduct set forth here that caused the deprivation of plaintiff's constitutional rights.

73.     Defendant Hendrickson also omitted exculpatory information from the six-page report that was attached as an exhibit to defendant Schubert's arrest warrant declaration, including: (1) defendant Hendrickson omitted from the police report that K. W. had written on the SPD Supplemental Investigation Report containing the Photographic Line-up Admonition "#3 [plaintiff's photograph] looks kind of like him but he's thicker."; (2) defendant Hendrickson omitted from the police report that before showing K. W. the photographic line-up she told K. W. that

"I found a picture of the guy who we think might be the person and I wanted to show it to you and see if it is," a statement that contradicts and dilutes the principles set forth in the Photographic Line-up Admonition; (3) defendant Hendrickson omitted from the police report that K. W. stated during the photographic line-up that "Five [#5] kind of looks like him"; (4) defendant Hendrickson omitted from the police report that she directed K. W. to sign the Photographic Line-up Admonition without telling K. W. to read the Photographic Line-up Admonition; (5) defendant Hendrickson omitted from the police report that during the photographic line-up K. W. pointed to the photograph of plaintiff and stated "he's too skinny – the guy I saw was much chunkier"; (6) defendant omitted from the police report that when K. W. again pointed to #3, the photograph of plaintiff, she said "*that* kind of looks like him" and (7) defendant Hendrickson omitted from the police report that K. W. did not read the Photographic Line-up Admonition before or after viewing the photographic line-up.

74.     But for the false statements and misrepresentations in the six-page police report and the omission of the truthful and exculpatory information from the police report attached to defendant Schubert's declaration there would not have been adequate evidence to support probable cause for issuance of the arrest warrant or the search warrant.

75.     On or about August 15, 2011, and as a result of the actions of defendants, an arrest warrant for the arrest of plaintiff was issued in the Superior Court, State of California, County of Sacramento.

76.     On or about August 17, 2011, defendants Hendrickson and LeRose conducted a search of plaintiff's residence in Los Angeles County pursuant to a search warrant that was based on a false affidavit signed by defendant Hendrickson.

77.     On or about August 17, 2011, and as a result of the actions of the defendants, defendants Hendrickson and LeRose caused the plaintiff J. N. to be

arrested in frightening fashion near his residence in Los Angeles County in the presence of numerous heavily armed officers, after which he was imprisoned continuously until April 3, 2012, as a result of the actions of the defendants.

78.    On or about August 17, 2011, defendant Hendrickson interviewed plaintiff and plaintiff explained to defendant Hendrickson that he had not committed the crimes committed against K. W. and that he had not used Facebook during the applicable time period.

79.    Defendants seized plaintiff's computer and a check of this computer revealed that there no Facebook account registered on the hard drive of the computer and there was no evidence found on the computer that a Facebook account had ever been used on the computer.

80.    In early September 2011, after the arrest of plaintiff on August 17, 2011, and while the criminal prosecution of plaintiff was pending, defendant Schubert informed defendant Hendrickson that plaintiff's attorney repeatedly stated to defendant Schubert that plaintiff was not "Pater Noster" but despite this warning defendant Hendrickson did nothing to question or verify her suspicion that plaintiff was "Pater Noster" and continued to prosecute plaintiff, while plaintiff remained incarcerated, up to and until the dismissal of the criminal case in Sacramento Superior Court in mid-February 2012, nor did she review her reports or correct the factual misstatements and false statements contained in her reports, which formed the basis for the arrest and prosecution of plaintiff.

81.    In mid-January 2012, Deputy District Attorney Kevin Jones told defendant Hendrickson that the case against plaintiff was weak and that it was comprised solely of K. W.'s March 31, 2011, tentative identification of plaintiff in the photographic lineup administered by defendant Hendrickson (which was not an identification of plaintiff at all), but despite this warning defendant Hendrickson did nothing to question or verify her suspicion that plaintiff was "Pater Noster" and

continued to prosecute plaintiff, while plaintiff remained incarcerated, up to and until the dismissal of the criminal case in Sacramento Superior Court in mid-February 2012, nor did she review her reports or correct the factual misstatements and false statements contained in her reports, which formed the basis for the arrest and prosecution of plaintiff.

82.    On February 9, 2012, an in-person lineup was conducted and K. W., who was then 13 years old, was unable to identify the suspect in the line-up, which included plaintiff J. N.

83.    All Case No. 11NF**** charges were dismissed against Plaintiff prior to any trial on the merits on or about February 15, 2012.

84.    On or about February 15, 2012, Plaintiff was then transferred to the custody of the U. S. Department of Justice and/or the U. S. District Court for the Eastern District of California.

85.    On or about February 23, 2012, the U. S. District Court for the Eastern District of California transferred the case of J. N. to the U. S. District Court for the Central District of California.

86.    On March 9, 2012, the U. S. District Court for the Central District of California ordered plaintiff detained and plaintiff was detained in the Central District of California.

87.    On April 2, 2012, the U. S. District Court for the Central District of California, on motion of the United States Attorney, ordered the case against plaintiff dismissed.

88.    Plaintiff would not have been charged with a supervised release violation but for the actions of the defendants in falsely arresting and maliciously prosecuting plaintiff; thus, defendants are responsible for the additional time in custody plaintiff suffered as a result of the U. S. District Court supervised release proceedings.

89.   Plaintiff was incarcerated with no justification for at least seven (7) months from August 17, 2011.

90.   Plaintiff was released from continuous incarceration on April 3, 2012, when he was released from incarceration in the County of Los Angeles.

91.   Defendants orchestrated the concealment and suppression of exculpatory evidence by, *inter alia*, failing to advise the prosecution that plaintiff did not have a Facebook account and did not use Facebook during the time period that K. W. was allegedly victimized.

92.   Despite the fact that the SPD, City of Sacramento, BRAZIEL, all policymakers and others knew, prior to March 31, 2011, that the individual defendant officers had on numerous occasions violated SPD rules, violated and deprived the rights of numerous arrestees and citizens by, *inter alia,* fabricating probable cause, making misrepresentations in police reports and under oath, concealing and suppressing exculpatory evidence, and fabricating and planting evidence, the defendants turned a blind eye to this knowledge, failed to train the individual defendant officers, and ratified their acts, and were complicit in and allowed the individual defendant officers to further victimize numerous persons and to engage in all of the practices listed in this paragraph and in this pleading.

93.   The injuries suffered by Plaintiff, *e.g.,* being arrested and incarcerated without probable cause and maliciously prosecuted were caused in part by the longstanding SPD policy, practice and custom of having no oversight of its operations, the failure to conduct any investigation into false arrests and malicious prosecution by SPD personnel against persons, and using the internal affairs bureau process to further falsify and whitewash incidents of false arrest and the use of excessive force.

94.   The defendants knew or should have known that there was no probable cause to arrest/charge plaintiff, Plaintiff J. N., with any crime.

95.    The defendants abandoned the investigation into the crimes allegedly perpetrated against K. W., failed to investigate the involvement of Alex James and "Pater Noster" in the criminal activities perpetrated against K. W. and other children, and condoned the continual perpetration of the crimes allegedly perpetrated against K. W. against other children.

96.    The defendants persisted in prosecuting Plaintiff J. N. in an effort to cover up the false arrest, malicious prosecution, fabrication of evidence and concealment and suppression of exculpatory evidence by officers and to prevent Plaintiff J. N. from obtaining redress against the defendants and the City of Sacramento.

97.    The crimes plaintiff was faced with defending himself against carried extremely long prison sentences, amounting to a de facto lifetime term of imprisonment.

98.    The defendants knew this and knew that the pressure on the plaintiff to accept a plea agreement was enormous because they knew that the punishment exposure for crimes of this nature was extreme and, knowing this, the defendants persisted in maliciously prosecuting plaintiff and suppressing exculpatory evidence, resulting in the continued prosecution of plaintiff, with the hope that plaintiff would succumb to the pressure and accept a plea agreement despite knowing or having reason to know that plaintiff was factually innocent, and this fraudulent and oppressive conduct and conduct in reckless disregard for plaintiff's fundmental rights necessitates an award of punitive damages against the defendants.

99.    As part of the conspiracy to falsely arrest and imprison and maliciously prosecute Plaintiff in order to, *inter alia,* cover up the severe, willful, despicable, base, vile, sadistic and criminal violation and deprivation of Plaintiff J. N.'s constitutional and human rights, defendants submitted false police reports lying about, concealing the truth of and fabricating about their interaction with Plaintiff on

1   or about August 17, 2011, and on other occasions.

2       100.   Defendants BRAZIEL, ROE and unknown named defendants were

3   instrumental in fostering the code of silence and culture of fear and deprivation of

4   constitutional rights on a systemic and institutional basis by performing the duty of

5   whitewashing all internal affairs complaints and arrestee complaints of wrongful

6   arrests, beatings of arrestees and like infractions perpetrated by Sacramento police

7   officers and employees, and did so in this case.

8       101.   The defendants met alone with each other, and, possibly, with other,

9   unknown named defendants, and combined, conversed, and planned amongst

10  themselves and agreed, with knowledge that plaintiff was deprived of his

11  constitutional rights, to participate in the continued perpetration of the actions that

12  resulted in the deprivation of the plaintiff's constitutional rights, including, but not

13  limited to agreeing to fabricate police reports, to make false statements to other

14  police officers, to fabricate probable cause, to suppress exculpatory evidence, to

15  commit perjury, and to present planted evidence having as their goal the conviction,

16  punishment and imprisonment of plaintiff J. N., and there was the commission of an

17  overt act in furtherance of the conspiracy or conspiracies, e.g., the suppression of

18  exculpatory evidence and falsification of the police reports pertaining to the seizure

19  and search authored by defendants, and approved by a supervisorial defendant.

20      102.   The illegal seizure and malicious prosecution of Plaintiff J. N.

21  occurred, at least in part, because the SPD and its policymakers

22  had/condoned/acquiesced in/was deliberately indifferent to the existence of a

23  policy/implicit policy/practice/custom of unlawful seizure and malicious

24  prosecution to cover up illegal seizure, maintaining the code of silence in the context

25  of crimes committed and enforcing their own code of silence within the SPD, and by

26  failing to train police officers in the correct and lawful methods of seizure;

27  Defendants City of Sacramento and the SPD maintained and/or maintain a custom,

28

policy or practice, and or tacitly approved a custom, policy or practice of acquiescing in/encouraging/fostering/being deliberately indifferent to/allowing/permitting and recklessly and/or intentionally engaging in illegal seizure, arrest without probable cause, malicious prosecution, fabrication of evidence, and concealment and suppression of exculpatory evidence.

103.   All supervisorial liability defendants, including, but not limited to BRAZIEL and DUBKE, set in motion a series of events that led to the unlawful arrest, incarceration and prosecution of plaintiff, and, specifically, defendant BRAZIEL, the Chief of Police of the SPD and overall supervisor of HENDRICKSON, and the other supervisors, including DUBKE, specifically ratified the actual conduct of defendant HENDRICKSON that is the subject of this action by (1) specifically approving the decisions made by HENDRICKSON on March 31, 2011, and thereafter, including the application for a search warrant of plaintiff's residence, leading up to the arrest and incarceration and prosecution of plaintiff, (2) specifically approving of the bases for those decisions made by HENDRICKSON, LEROSE and others, and (3) so ratifying and approving of the decisions and bases for the decisions of HENDRICKSON, LEROSE and others by means of the product of a conscious, affirmative choice to ratify the decisions and conduct of HENDRICKSON, LEROSE and others, resulting in the false arrest, the incarceration and the malicious prosecution of plaintiff, and these conscious decisions on the part of defendant BRAZIEL and his subordinate supervisors and policymakers within the SPD have resulted in similar incidents involving other innocent persons.

104.   Defendants CITY, SPD and BRAZIEL have ample reason to know, based upon complaints, arrest reports, claims for damages, and, *inter alia*, internal affairs reports and records, that SPD's officers and/or employees regularly engage in the misdeeds set forth throughout this complaint.

105.   CITY, SPD and/or BRAZIEL, each of them or any combination of them were on actual or constructive notice that the SPD training program/regimen contained lacunae and deficiencies that caused SPD police officers to conduct themselves in a manner that deprived people of their constitutional rights under the fourth and fourteenth amendments to freedom from unreasonable search and seizure under the circumstances presented in this case, i.e., by being falsely identified and accused of having committed crimes involving the exploitation of children via the Internet, yet these defendants chose in the face of this knowledge to retain the deficient training program.

106.   Thus, the defendants' policy of inaction to the deficiencies of the SPD training program constituted a decision on the part of the CITY, the SPD and BRAZIEL to violate the constitution.

107.   Specifically, the SPD training program was deficient in its failure to train SPD police officers (1) how to identify suspects who commit crimes via the Internet, (2) how to conduct computer forensic examinations of the Internet and of computers to identify Internet perpetrators, (3) how to interview witnesses to isolate critical details of an Internet crime in order to eliminate as suspects persons who are innocent, (4) how to analyze Facebook and other Internet application data in order to geographically locate suspects during a specific time frame, and *inter alia* (5) how to conduct photographic lineups.

108.   Plaintiff alleges that these failures are the result of deliberate indifference on the part of defendants CITY, SPD, and BRAZIEL by and through their decision makers and subordinates.

109.   The foregoing unconstitutional failures to train were a direct and legal cause of harm to plaintiff.

110.   Defendants CITY and/or SPD implement a de facto policy, custom or practice or a hybrid of policy, custom and/or practice or any combination thereof of

fostering SPD police response to internet child sex crimes by (1) engaging in ruses and deception when interviewing persons of interest in an effort to extract false confessions instead of uncovering exculpatory information that would eliminate persons of interest as a suspect, (2) ignoring clues and evidence that point to the innocence of a person who has been arrested, (3) failing to obtain and properly review computer information seized from persons, (4) failing to understand internet technology, such as Facebook and chat room technology, and thus failing to use such technology in the investigation of crimes, (5) realizing that an innocent person may have been arrested, attempting to cover up mistakes by encouraging and facilitating the malicious prosecution of such persons by the District Attorney in order to launder mistakes made by the police, and (6) providing false information to the District Attorney in the course of prosecutions in order to cause the District Attorney to institute prosecutions and continue to prosecute innocent persons and persons.

111.   The foregoing unconstitutional policies, practices and/or customs were a direct and legal cause of harm to Plaintiff.

112.   Defendants CITY's and SPD's failures to train, as described herein, were within the control of Defendants CITY and SPD and within the feasibility of Defendants CITY and SPD to alter, adjust and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

113.   As a result of the defendants' conduct, which was perpetrated intentionally, recklessly, wantonly, fraudulently, oppressively, and or with reckless disregard for the rights of Plaintiff J. N. and others, and which is so despicable that it is despised by ordinary people, Plaintiff J. N. suffered all of the damages mentioned herein, including humiliation, fear, feelings of degradation and helplessness, sleeplessness, anguish, despair, fright, severe mental and emotional distress, depression, distrust, and embarrassment in violation of her federal

constitutional rights and his rights under the laws of the State of California, and plaintiff is entitled to punitive damages.

114.   All Defendants acted without authorization of law.

115.   Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each defendant ratified, approved and acquiesced in the violations alleged herein.

116.   As joint actors with joint obligations, each defendant was and is responsible for the failures and omissions of the other.

117.   Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

118.   Each Defendant acted with a deliberate indifference to or reckless disregard for an accused's rights for the truth in withholding evidence from prosecutors, and/or for the plaintiff's right to an eyewitness identification free from improper suggestion, for an investigation free of active concealment of material facts, and/or for the plaintiff's right to due process of law.

119.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused plaintiff to sustain damages in a sum to be determined at trial.

120.   Due to the acts of the defendants, plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury. For such injury, plaintiff will incur significant damages based on psychological and medical care.

121.   As a further result of the conduct of each of these defendants, plaintiff has lost past and future earnings in an amount to be determined according to proof at

trial.

122.   By reason of the above described acts and omissions of defendants, plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, plaintiff requests payment by defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## Claim for Relief No. 1

### Deprivation of Constitutional Rights – Fourth/Fourteenth Amendments – Judicial Deception - 42 U.S.C. § 1983

### Against all Sacramento Police Department Individual Defendants, Except Braziel, and Defendant Schubert

123.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

124.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws, and under Amendment IV to be free from unreasonable searches and seizures, were in force and effect and the individual defendants who engaged in conduct, as set forth above, who met, combined, conferred and formed an agreement amongst themselves to arrest plaintiff without probable cause and to subject Plaintiff J. N. to unlawful search and seizure and who falsified search warrant affidavits, falsified the results of a photographic lineup, seized and subjected Plaintiff J. N. to illegal search and seizure, and to the use of excessive force, deprived Plaintiff J. N. of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution, which proximately caused the severe and permanent injuries to Plaintiff J. N., by attempting to fabricate and by fabricating alleged facts, by suppressing and or

concealing evidence, by agreeing to maintain a code of silence about the Incident to obfuscate the truth and hinder the discovery of the truth surrounding the illegal arrest of Plaintiff J. N. in order to cover up the deprivation of Plaintiff J. N.'s constitutional rights.

### Claim For Relief No. 1A

### Deprivation of Constitutional Rights - Fourth/Fourteenth Amendments – Judicial Deception - 42 U.S.C. § 1983

### Against all Sacramento Police Department Supervisorial Defendants including Braziel, Dubke and other Supervisorial Defendants

125.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

126.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and excessive and unreasonable force, were in force and effect and the individual defendants who engaged in conduct, as set forth above, who arrested plaintiff without probable cause, seized and subjected Plaintiff J. N. to illegal search and seizure and to the use of excessive force, deprived Plaintiff J. N. of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution and did conspire to deprive Plaintiff J. N. of his rights and to cover up the aforesaid constitutional deprivations which proximately caused the severe and permanent injuries to Plaintiff J. N., by attempting to fabricate and by fabricating alleged facts to conceal their involvement in the illegal arrest and search of Plaintiff J. N., by suppressing and or concealing evidence, by agreeing to maintain a code of silence about the Incident to obfuscate the truth and hinder the discovery of the truth surrounding the illegal arrest of

Plaintiff J. N., in order to cover up the deprivation of Plaintiff J. N.'s constitutional rights.

### Claim For Relief No. 1B

### Deprivation of Constitutional Rights - Fourth/Fourteenth Amendments – Judicial Deception - 42 U.S.C. § 1983 - *Monell/Municipal Liability* Against any and all *Monell* Defendants

127.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

128.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures were in force and effect and the individual defendants who engaged in conduct, as set forth above, who arrested plaintiff without probable cause, and seized and subjected Plaintiff J. N. to illegal search and seizure and to the use of excessive force, deprived Plaintiff J. N. of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution.

129.   Defendant CITY OF SACRAMENTO, by and through its agents SPD and Defendant BRAZIEL, who had final policymaker authority and who had authority on behalf of the City to delegate such authority, delegated final policymaking authority to Doe defendants for the investigation of internet-related child exploitation crimes, including the investigation involving K. W. against plaintiff.

130.   This cause of action arises under United States Code, Title 42, Section 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege or immunity secured to them, respectively, by the Fourth, Fifth, Sixth and

Fourteenth Amendments to the United States Constitution.

131.   Defendants violated Plaintiff's constitutional rights by creating and maintaining, among other things, the following unconstitutional customs and practices, inter alia:

132.   Defendants CITY and/or SPD implemented a de facto policy, custom or practice or a hybrid of policy, custom and/or practice in cases involving exploitation of children by means of the Internet of arresting persons without probable cause and maliciously prosecuting persons by (1) failing to obtain the expertise in social media software and systems necessary to identify computers that connect to social media sites, including chat rooms, (2) failing to obtain the expertise in social media software and systems necessary to identify persons who connect to social media sites, including chat rooms, (3) ignoring and suppressing exculpatory evidence, (4) failing to investigate multiple suspects, (5) failing to investigate leads pointing to suspects, (6) failing to obtain the expertise in computer science necessary to a basic understanding of how computers connect to the Internet, (7) failing to obtain and preserve digital evidence (i.e., evidence from computers (including "smart phones", tablets and laptop computers) and servers) that carried digital "fingerprints" of and identified the actual perpetrators of the crimes reported, and (8) ignoring alibis.

133.   In addition, the Sacramento Police Department had no established or clear policy regarding the following issues pertaining to eyewitness identification: (1) ensuring that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite*, 432 U.S. 98, (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972); (2) ensuring that police personnel, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; (3) fully and completely documenting police personnel's interactions with eyewitnesses; (4) training police

personnel to provide to the prosecutor eyewitness identification information that is exculpatory in the case in which the eyewitness was making an identification; and (5) supervising police personnel in the provision of exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

134.   Plaintiff is informed and believes that to the extent that the Sacramento Police Department had policies regarding the issues set out in the foregoing paragraph, the policies were not implemented by police personnel in cases in which an eyewitness was used. Not only were no such titular policies implemented or followed, but the Sacramento Police Department had a custom and practice of (1) failing to ensure that eyewitness identification procedures complied with the requirements of due process, including those set out in *Manson v. Braithwaite* and *Neil v. Biggers;* (2) failing to ensure that police personnel, whether through inadvertence or design, did not provide information to potential eyewitnesses that influenced the identification; (3) failing to ensure that police personnel fully and completely documented their interactions with eyewitnesses; (4) failing to properly or adequately train police personnel in the provision of eyewitness identification information that is exculpatory to the prosecutor(s) in the case in which the eyewitness was making an identification; and (5) failing to properly or adequately supervise police personnel in the provision of eyewitness identification information that is exculpatory to the prosecutor(s) in the case in which in which the eyewitness was making an identification.

135.   In this case it was CITY and SPD de facto policy, custom or practice or a hybrid of policy, custom and/or practice that caused defendants HENDRICKSON et al. to (1) fail to investigate suspects other than plaintiff, (2) fail to understand how computers connected to the social media websites that were at issue, (3) fail to understand how suspects connected to the social media websites that were at issue,

(4) fail to verify whether plaintiff had a Facebook account, (5) fail to properly handle the eyewitness identification procedures, (6) fail to obtain and preserve digital evidence that identified the actual perpetrator(s) of the crimes reported.

136.   Defendants CITY's and SPD's policies and/or customs caused and were the moving force or affirmative link behind some or all of the violations of Plaintiff's constitutional rights at issue in this case.

137.   Defendants CITY, SPD, and BRAZIEL, maintain a custom, policy and/or practice or a hybrid of policy, custom and/or practice or any combination thereof of not properly supervising and/or disciplining their respective employees, officers, managers and supervisors for failing to observe and act in compliance with the legal requirements and protections applicable to persons as set forth in the U.S. and California Constitutions, and other laws as set forth in this complaint, including but not limited to Cal Civ. Code §§ 51, 51.7, 52; 42 U.S.C. §1983 and the First, Fourth and Fourteenth Amendments to the U.S. Constitution; this policy/custom/practice or hybrid manifested itself in a chronic failure on the part of the SPD, BRAZIEL and CITY to thoroughly investigate leads, complaints of or other evidence of police misconduct, the failure to locate and interview potential witnesses to police misconduct, the failure to locate, preserve, maintain and analyze evidence of police misconduct, the standardless acceptance of accounts of events given by police officers even in the face of evidence that such accounts are false, self-serving and tainted by self-interest or common sense logic that shows that such accounts do not withstand scrutiny and are false or misleading, and, *inter alia*, the lack of any efficient or useful recordkeeping system to track allegations of police misconduct by SPD officers.

138.   The unconstitutional customs and practices of the defendants were a direct and legal cause of harm to plaintiff.

139.   Defendants CITY's, and SPD's policy, custom and/or practices, as

described herein, were within the control of Defendants CITY and SPD and within
the feasibility of Defendants CITY and SPD to alter, adjust and/or correct so as to
prevent some or all of the unlawful acts and injury complained of herein by
Plaintiffs.

140.   Defendants violated Plaintiff's constitutional rights, as alleged herein
above, by, among other things, failing to train as follows, inter alia:

141.   Defendants CITY, SPD and BRAZIEL had ample reason to know,
based upon complaints, arrest reports, claims for damages, inter alia, that SPD's
officers and/or employees regularly engage in the misdeeds set forth throughout this
complaint.

142.   CITY, SPD and/or BRAZIEL, each of them or any combination of
them were on actual or constructive notice that the SPD training program/regimen
was deficient to the degree that caused  the unconstitutional polices, customs and
practices described above and caused SPD police officers to conduct themselves in a
manner that deprived people of their constitutional rights under the fourth, fifth and
fourteenth amendments to freedom from unreasonable search and seizure, from
malicious prosecution and from fabricated evidence, yet these defendants chose in
the face of this knowledge to retain the deficient training program.

143.   Thus, the defendants' policy of inaction to the deficiencies of the SPD
training program constituted a decision on the part of the CITY, the SPD and
BRAZIEL to violate the constitution.

144.   Specifically, the SPD training program was deficient in its failure to
train SPD police officers (1) to obtain the expertise in social media software and
systems necessary to identify computers that connect to social media sites, including
chat rooms, (2) to obtain the expertise in social media software and systems
necessary to identify persons who connect to social media sites, including chat
rooms, (3) to identify exculpatory evidence and to report exculpatory evidence to

the prosecutors, (4) to investigate multiple suspects, (5) to investigate leads pointing to suspects, (6) to obtain the expertise in computer science necessary to a basic understanding of how computers connect to the Internet, and (7) to obtain and preserve digital evidence (i.e., evidence from computers (including "smart phones", tablets and laptop computers) and servers) that carried digital "fingerprints" of and identified the actual perpetrators of the crimes reported.

145. The foregoing unconstitutional failures to train were a direct and legal cause of harm to Plaintiff.

146. Defendants BRAZIEL and DUBKE acted in supervisory capacities with respect to the incidents involving decedent; as supervisors, Defendants BRAZIEL and DUBKE acted intentionally, maliciously, in conscious disregard, and with deliberate indifference to the rights of the decedent and others similarly situated and these supervisory failures directly caused and contributed to Plaintiff's damages.

147. Defendants CITY's, SPD's and BRAZIEL's failures to train, as described herein, were within the control of Defendants CITY and SPD and within the feasibility of Defendants CITY and SPD to alter, adjust and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

148. The actions and inactions of the SPD and BRAZIEL set forth in the preceding paragraphs were known or should have been known to the policy makers responsible for the SPD and occurred with deliberate indifference to either the recurring constitutional violations elaborated here, and or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training was obvious.

**Claim For Relief No. 2**

**Deprivation of Constitutional Rights – Fourth/Fifth/Sixth/Fourteenth Amendments – Malicious Prosecution and Conspiracy - 42 U.S.C. § 1983 Against all Sacramento Police Department Individual Defendants except Braziel**

149.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

150.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and malicious prosecution and under Amendment VI to a fair trial, were in force and effect and the individual defendants who engaged in conduct, as set forth above, who met, combined, conferred and formed an agreement amongst themselves to subject Plaintiff J. N. to malicious prosecution and who subjected Plaintiff J. N. to malicious prosecution, deprived Plaintiff J. N. of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution in Case No. 11NF****, which violated those rights, violated the fourteenth amendment to the United States Constitution and did conspire to deprive Plaintiff J. N. of his rights and to cover up the aforesaid constitutional deprivations which proximately caused the severe and permanent injuries to Plaintiff J. N., by fabricating evidence and probable cause and suppressing and or concealing exculpatory evidence, by agreeing to maintain a code of silence about the Incident to obfuscate the truth and hinder the discovery of the truth surrounding the illegal arrest of Plaintiff J. N. and the illegal prosecution of Plaintiff J. N., and by agreeing to confuse, cloud and falsify facts pertaining to the arrest and malicious prosecution of Plaintiff J. N. in order to cover up the deprivation of Plaintiff J. N.'s constitutional rights.

**Claim For Relief No. 2A**

**Deprivation Of Constitutional Rights – Fourth/Fifth/Sixth/Fourteenth**

**Amendments – Malicious Prosecution - 42 U.S.C. § 1983**

**Against all Sacramento Police Department Supervisorial Defendants including**

**Braziel, Dubke and other Supervisorial Defendants**

151.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

152.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and excessive and unreasonable force and under Amendment VI to a fair trial, were in force and effect and the individual defendants who engaged in conduct, as set forth above, who engaged in conduct, as set forth above, who met, combined, conferred and formed an agreement amongst themselves to subject Plaintiff J. N. to malicious prosecution and who subjected Plaintiff J. N. to malicious prosecution, deprived Plaintiff J. N. of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution in Case No. 11NF****, which violated those rights, violated the fourteenth amendment to the United States Constitution and did conspire to deprive Plaintiff J. N. of his rights and to cover up the aforesaid constitutional deprivations which proximately caused the severe and permanent injuries to Plaintiff J. N., by fabricating evidence and suppressing and or concealing exculpatory evidence, by agreeing to maintain a code of silence about the Incident to obfuscate the truth and hinder the discovery of the truth surrounding the arrest and malicious prosecution of Plaintiff J. N.

**Claim For Relief No. 2B**

**Deprivation of Constitutional Rights - Fourth/Fourteenth Amendments - 42 U.S.C. § 1983 –Malicious Prosecution - *Monell/Municipal Liability* Against any and all *Monell* Defendants**

153.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

154.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and under Amendment VI to a fair trial were in force and effect and the individual defendants who engaged in conduct, as set forth above, who subjected Plaintiff J. N. to malicious prosecution, deprived Plaintiff J. N. of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution in Case No. 11NF****, deprived Plaintiff of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution.

**Claim For Relief No. 3**

**Deprivation Of Constitutional Rights – Fourth/Fifth/Sixth/Fourteenth Amendments – Fabrication of Evidence - 42 U.S.C. § 1983 Against all Individual Sacramento Defendants except Braziel**

155.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

156.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws, under Amendment IV to be free from unreasonable searches and seizures, and malicious prosecution, and under Amend. VI to, *inter*

*alia,* a fair trial, were in force and effect and the individual defendants who engaged in conduct, as set forth above, and also met, combined, conferred and formed an agreement amongst themselves to subject Plaintiff to malicious prosecution and who fabricated evidence that led to the arrest, imprisonment and prosecution of Plaintiff, deprived Plaintiff of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution, which violated those rights, violated the fourteenth amendment to the United States Constitution.

## Claim For Relief No. 3A

## Deprivation Of Constitutional Rights – Fourth/Fifth/Sixth/Fourteenth

## Amendments – Fabrication of Evidence - 42 U.S.C. § 1983

## Against all Sacramento Police Department Supervisorial Defendants including

## Braziel and Dubke

157.  Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

158.  At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and excessive and unreasonable force and under Amendment VI to a fair trial, were in force and effect and the individual defendants who engaged in conduct, as set forth above, and also met, combined, conferred and formed an agreement amongst themselves to subject Plaintiff to malicious prosecution and who fabricated evidence that led to the arrest, imprisonment and prosecution of Plaintiff, deprived Plaintiff J. N. of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution.

## Claim For Relief No. 3B

CV-14-02428-DDP(PLAx)

**44 - THIRD AMENDED COMPLAINT**

**Deprivation Of Constitutional Rights - Fourth/Fifth/Sixth/Fourteenth Amendments – Fabrication of Evidence - 42 U.S.C. § 1983 - *Monell/Municipal Liability***

**Against any and all *Monell* Defendants**

159.   Plaintiff realleges and incorporates here the foregoing paragraphs as well as any subsequent paragraphs in the complaint as if fully set forth herein.

160.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amendment IV to be free from unreasonable searches and seizures and under Amendment VI to a fair trial were in force and effect and the individual defendants who engaged in conduct, as set forth above, and also met, combined, conferred and formed an agreement amongst themselves to subject Plaintiff to malicious prosecution and who fabricated evidence that led to the arrest, imprisonment and prosecution of Plaintiff, deprived Plaintiff J. N. of his constitutional rights, which violated those rights, violated the fourteenth amendment to the United States Constitution.

**Claim For Relief No. 4**

**Deprivation Of Constitutional Rights - Fourth/Fifth/Sixth/Fourteenth Amendments – Suppression of Exculpatory Evidence - 42 U.S.C. § 1983 - Against all Sacramento  Defendants**

161.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amend. VI to, *inter alia,* a fair trial were in force and effect and the individual defendants who engaged in conduct, as set forth above, who met, combined, conferred and formed an agreement amongst

themselves to suppress exculpatory evidence and subjected Plaintiff to prosecution without probable cause, deprived Plaintiff of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution, which violated those rights, violated the fourteenth amendment to the United States Constitution.

## Claim For Relief No. 4A

### Deprivation Of Constitutional Rights - Fourth/Fifth/Sixth/Fourteenth Amendments – Suppression of Exculpatory Evidence - 42 U.S.C. § 1983 - Against all Supervisory Defendants

162.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amend. VI to, *inter alia,* a fair trial were in force and effect and the individual defendants who engaged in conduct, as set forth above, who met, combined, conferred and formed an agreement amongst themselves to suppress exculpatory evidence and subjected Plaintiff to prosecution without probable cause, deprived Plaintiff of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution, which violated those rights, violated the fourteenth amendment to the United States Constitution.

## Claim For Relief No. 4B

### Deprivation Of Constitutional Rights - Fourth/Fifth/Sixth/Fourteenth Amendments – Suppression of Exculpatory Evidence - 42 U.S.C. § 1983 - Against all *Monell* Defendants

163.   At the time of the Incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under both Amendment V and XIV to the United States Constitution to due process of law and the equal protection of the laws and under Amend. VI to, *inter alia,* a fair trial were in force and effect and the individual defendants who engaged in conduct, as set

forth above, who met, combined, conferred and formed an agreement amongst themselves to suppress exculpatory evidence and subjected Plaintiff to prosecution without probable cause, deprived Plaintiff of his constitutional rights, causing him to be incarcerated and subjected to criminal prosecution, which violated those rights, violated the fourteenth amendment to the United States Constitution.

PRAYER

WHEREFORE, plaintiff prays for judgment against these defendants, and each of them, as follows:

1.    For special damages for legal, medical and related expense, according to proof;

2.    For general damages according to proof;

3.    For punitive damages against the individual defendants in an amount sufficient to make an example of them and to deter others;

4.    For declaratory relief;

5.    For reasonable attorney fees pursuant to 42 U.S.C. § 1988;

6.    For plaintiff's costs of suit herein;

7.    For such other and further relief as this Court deems just.

DATED: March __12__, 2015                Jeff Dominic Price

                         By    /s/ *Jeff Dominic Price*
                               Jeff Dominic Price, Esq.
                               Attorney for Plaintiff

DEMAND FOR JURY

The plaintiff demands trial by jury of all issues.

                /s/ *Jeff Dominic Price*
                Jeff Dominic Price
                Attorney for Plaintiff

## **Proof of Service**

I, Jeff Price, declare that I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action. My business address is 1311 Broadway, Santa Monica, California 90404.

On March 15, 2015, I served the foregoing documents, described as THIRD AMENDED COMPLAINT [*J. N. v. Hendrickson et al.*, 2:14-CV-02428-DDP(PLAx)] on counsel for the interested parties in this action:

☒ by transmitting a true copy thereof/placing a true copy thereof enclosed in a sealed envelope addressed to:

*See* Attachment

☐ by mail as follows: Pursuant to the business practice at my place of business, under which correspondence so collected and processed is deposited with the United States Postal Service that same day with postage fully prepaid at Santa Monica, California in the ordinary course of business.

☒ by Email on March __15__, 2015, as follows: I delivered such document by email via CM/ECF to the attorneys for the following parties: See Attachment.

Executed on March __15__, 2015, at Santa Monica, California.

☒ I declare under penalty of perjury that the foregoing is true and correct.

_____
/s/
J. PRICE

## **Attachment**

Sean Richmond
Sr. Deputy City Attorney, City of Sacramento
915 I Street, Fl. 4
Sacramento, California  95814
Attorneys for Defendants