O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| J.N., | ) | Case No. 2-14-cv-02428-DDP (PLAx) |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR REMITTITUR** |
| v. | ) | |
| | ) | [Dkt. 149] |
| DET. HEATHER M. HENDRICKSON, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Presently before the Court is Defendant Heather M. Hendrickson's Motion for New Trial, or, in the Alternative, Request for Remittitur. After reviewing the parties' submissions and hearing oral argument, the Court adopts the following Order.

**I. BACKGROUND**

Plaintiff J.N. filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his Fourth and Fourteenth Amendment Rights on the basis of judicial deception and malicious prosecution by Defendant Det. Heather Hendrickson. (*See* Third Amended Complaint.) The facts, as presented at trial, are as follows.

In late March 2011, the Sacramento Police Department received a report from Nicole W. that her 12-year-old daughter, K.W., had been the victim of internet sex crimes. During the preceding months, K.W. had been contacted on Facebook by a man with the name "Pater Noster." Pater Noster spoke to K.W. through text and video chats. During these conversations, Pater Noster victimized K.W. by exposing himself, performing lewd acts while she was on a video chat, and encouraging her to undress for him on video.

On approximately March 31, 2011, Det. Hendrickson was assigned to the case by the Sacramento Police Department. Det. Hendrickson began her investigation by searching for the name "Pater Noster" in a California mugshot database. Det. Hendrickson got one result from her search: a man named John Noster who had, at times, gone by the alias "John Pater." Based on this result, Det. Hendrickson prepared a "six-pack"—an array of six photographs, which included John Noster's photograph at position number three. Det. Hendrickson then conducted a video-recorded interview of K.W. During the interview, Det. Hendrickson asked K.W. about her encounters with Pater Noster. Det. Hendrickson then delivered a series of admonishments and proceeded to show K.W. the six-pack. Specifically, Det. Hendrickson said, "I think we found a picture of the guy who we think might be the person . . . I want to show it to you and see if it is, okay?" She followed up by noting, "If the person that you saw is not in that series of photographs, then tell me, okay . . . We don't want to be going after the wrong guy. So if he's in there, excellent. If he's not, we need to know that too." K.W. proceeded to look at the photographs. She pointed at one picture and said, "He's too dark." K.W. then pointed at photograph number 3 (John Noster's photograph) and said, "He is too skinny, the guy I saw was much chunkier." After a few seconds, K.W. returned to photograph number 3 and said, "That kind of looks like him. . . . The rest of them don't even look close to him." Based on this statement, Det. Hendrickson directed K.W. to circle photograph number 3.

After this interview, Det. Hendrickson spoke with an agent from Federal Bureau of Investigation, Special Agent Schofield. According Schofield, who testified at trial, Det.

2

Hendrickson discussed Pater Noster's activities with the FBI and was told that the FBI would issue a subpoena to Facebook for Pater Noster's account information. At trial, Det. Hendrickson stated that she did not follow up with the FBI for the results of the subpoena and was not aware until approximately January or February 2012 that the subpoena results indicated that Pater Noster had logged into Facebook from a computer with an IP address originating in Vienna, Austria.

Over the next few months, Det. Hendrickson continued the investigation by communicating with Pater Noster over Facebook using K.W.'s computer and account. She also reached out to the Los Angeles Police Department for assistance because her primary suspect, John Noster, lived in the Los Angeles area. In August 2011, Det. Hendrickson received word that the Los Angeles Police Department was prepared to assist in the case. Det. Hendrickson prepared a search and arrest warrant for John Noster, which she then presented to a judge. According to Plaintiff, the report Det. Hendrickson attached to the warrant application contained a number of inaccuracies and gave rise to his claims for judicial deception and malicious prosecution. First, the report omitted the fact that Det. Hendrickson may have tainted the six-pack identification by indicating to K.W. that she thought she "found a picture of the guy" before showing the photo array. Second, the report did not accurately reflect K.W.'s remarks during the photo identification. During the interview, K.W. affirmatively states that the man depicted in photograph number 3 "is too skinny" and only later says that "[he] kind of looks like him." By contrast, the report states that "Victim W. stated that # 3 (Suspect Noster) looked like the person she knew as "Pater." Third, Plaintiff argued that the report confusingly switched between the names "Pater Noster" and "Suspect Noster" in a manner that indicated Det. Hendrickson had actually communicated with John Noster (Suspect Noster) on Facebook rather than a man who used the name "Pater Noster" online. Fourth, the report did not indicate that Det. Hendrickson requested an IP lookup or report the results of the IP search, which would have shown that Pater Noster's computer IP address originated in Austria.

3

The warrant was approved and, on August 17, 2011, Det. Hendrickson and LAPD executed the warrant and arrested Plaintiff while he was waiting outside his apartment for the bus to work. Plaintiff testified that he was confused and fearful during his arrest. Plaintiff remained in detention for approximately eight months. At his initial booking, Plaintiff recalls a person calling out to another officer that he was accused of raping a young child and that they should "beat the shit out of him." While detained, Plaintiff was held in protective custody because of his status as a suspected sex crime offender. During his time in jail, Plaintiff reported being assaulted by fellow inmates on four occasions because of the crimes he was accused of committing.

While Plaintiff remained in custody, additional developments occurred in the case. In September 2011, a district attorney working on the case reached out to Det. Hendrickson to inquire about the strength of the case, noting there was reason to think this might be the wrong person. In October 2011, Det. Hendrickson learned that the computers seized from Plaintiff's home contained no evidence indicating he was Pater Noster. In December 2011, Plaintiff's defense counsel informed the district attorney's office that he had confirmed "Pater Noster" was still active on Facebook. During this time, the district attorney assigned to the case reached out to Det. Hendrickson indicating concerns about the strength of the case and requesting further updates but received no response. In January 2012, Plaintiff's defense counsel was able to view the recorded interview of K.W. for the first time. He shared that video with the district attorney, raised concerns about the tainted identification, and asked for the charges to be dropped. In early February 2012, a live lineup was conducted. but K.W. was unable to identify Plaintiff at the lineup. On February 15, 2012, the District Attorney dismissed the case for insufficient evidence. Due to Plaintiff's prior convictions, none of which were for sex crimes, he was transferred to federal custody and not actually released until April 3, 2012.

During trial, defense counsel acknowledged a number of the key facts and that "mistakes were made" during the investigation. Nonetheless, counsel urged a defense

4

verdict on the ground that the negligence in this case did not rise to the level of judicial deception or malicious prosecution. After a four-day trial, the jury returned a verdict finding Det. Hendrickson liable on both causes of action. The jury awarded $5,000,000 in compensatory damages and $5,000 in punitive damages. (Dkts. 136, 138.) Judgment was entered on March 28, 2017. (Dkt. 143.)

Defendant now moves for an order granting a new trial or, in the alternative, a remittitur of the jury's award for damages.

**II. LEGAL STANDARD**

Federal Rule of Civil Procedure 59 governs motions for a new trial. Pursuant to Rule 59(a)(1), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although Rule 59 does not enumerate specific grounds for a new trial, the Ninth Circuit has held that "'the trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)) (brackets omitted). A miscarriage of justice can occur where there is prejudicial misconduct from opposing counsel or where legal error was unduly prejudicial to the opposing party. A district court "enjoys considerable discretion in granting or denying the motion." *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003).

When the movant claims that a verdict was against the clear weight of the evidence at trial, a new trial should be granted "[i]f, having given full respect to the jury's findings, the judge . . . is left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir. 1987). A "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

When a court determines that a damages award is excessive, it may grant a defendant's motion for a new trial or conditionally deny the motion, provided the plaintiff accepts a remittitur. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983); Fed. R. Civ. P. 59(a)(1)(A). The remittitur, or reduced damage award, "must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081. 1094 (9th Cir. 2014) (internal quotation and citation omitted). The plaintiff may choose either to accept the reduced damage award or to submit to a new trial. *Fenner*, 716 F.2d at 603.

**III. DISCUSSION**

Defendant's Motion presents three grounds for ordering a new trial or, in the alternative, granting a remittitur. First, Defendant argues that the jury's award of $5 million in compensatory damages was excessive and against the weight of the evidence. (Mot. 3.) Next, Defendant argues that the Court's examination of Det. Hendrickson was highly prejudicial. (*Id.*) Finally, Defendant contends that the Court erroneously "precluded after-acquired incriminating evidence" despite allowing "after-acquired exculpatory evidence."(*Id.*) In her reply brief, Defendant only addresses the argument that the jury verdict was excessive. Although Defendant may have abandoned the remaining two issues, the court nonetheless addresses them out of an abundance of caution before turning to whether the evidence supported the compensatory damage award.

**A. Grounds for New Trial**

The Court begins with Defendant's contention that Det. Hendrickson was asked questions by the Court on two occasions in a "highly prejudicial" manner. The first was regarding Det. Hendrickson's testimony about admonitions she delivered to K.W. prior to showing the six-pack and the second was regarding the fact that the investigative files in this case were thrown away after Det. Hendrickson was reassigned from the case.

Federal Rule of Evidence 614 provides district courts broad discretion to question witnesses. *See* Fed. R. Evid. 614. The Ninth Circuit has explained, "It is entirely proper for

[the trial judge] to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony[.]" *Swinton v. Potomac Corp.*, 270 F.3d 794, 808 (9th Cir.2001) (internal quotation marks and citation omitted). A judge, however, "must not adopt a partisan stance." *United States v. Medina-Verdugo*, 637 F.2d 649, 653 (9th Cir. 1980). FRE 614(c) provides that "[a] party may object to the court's . . . examining a witness either at that time or at the next opportunity when the jury is not present." Fed. R. Evid. 614(c).

Plaintiff contends Defendant is barred from objecting to the Court's examination of Det. Hendrickson because of the failure to object either at the time of the questioning or the "next opportunity when the jury is not present." (*See* Opp'n 20.) Although neither side has identified Ninth Circuit authority on the consequences of failing to timely raise a FRE 614 objection, other courts of appeals have held that such a failure precludes later review. *See Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) ("If a party fails to object to the court's interrogation of a witness at trial, his objection will not be reviewed on appeal."); *See United States v. Vega*, 589 F.2d 1147, 1152-53 (2d Cir. 1978) (same); *Faudree v. Iron City Sand & Gravel Co.*, 315 F.2d 647, 651–52 (3d Cir. 1963); *Vergott v. Deseret Pharmaceutical Co.*, 463 F.2d 12, 17 (5th Cir. 1972); *see also Hanson v. Waller*, 888 F.2d 806, 813 (11th Cir. 1989) (holding that failure to timely object is deemed waiver unless the examination constitutes plain error); *United States v. Hickman*, 592 F.2d 931, 936 (6th Cir. 1979) (subjecting court's questioning to plain error review despite counsel's failure to timely object). In light of Defendant's failure to object at any point during the trial, the court deems the objection waived and concludes that it does not justify ordering a new trial.

Assuming, however, that the failure to object is excusable, the court would nonetheless find the argument unavailing on the merits. First, while the court recognizes that Defendant had to prepare the instant motion without the benefit of the transcript, a review of the relevant excerpts demonstrates that the Motion does not accurately

represent the exchanges at issue. According to the Motion, when Det. Hendrickson testified that she told K.W. "if you see him (Pater Noster) here, great, if not, we need to know that too," the Court purportedly responded by "incredulously ask[ing] Detective Hendrickson, 'why would you say that?'" (Mot. 9.) The Motion goes on to contend that "the tone and disgust" of the Court's questioning made it "abundantly clear" to the jury that the Court felt Det. Hendrickson's comment was inappropriate. (*Id.*) The transcript, however, reflects a different exchange. The excerpt begins with Det. Hendrickson testifying that she told K.W., "If he's in here, excellent. If he's not, we need to know that too so we don't head in the wrong direction." (Dkt. 160 (Reporter's Transcript ("RT") Day 2 at 33:2-4.). After that answer, the Court asked: "What does that mean 'if he's in here, excellent'? What are you communicating to the child at that point, 'If he's in here, excellent'?" (*Id.* at 33:5-7.) Det. Hendrickson answered that she "was trying to put it in – in words that a 12-year-old would understand." (*Id.* at 33:8-9.) The Court responded "Okay." (*Id.* at 33:11.) Det. Hendrickson then followed up with additional clarification and the Court said, "Thank you." (*Id.* at 33:12-18.)

The second occasion raised by the motion was Det. Hendrickson's testimony that her investigative files were thrown away after she was reassigned from detective to patrol officer during the investigation. (*Id.*) The Motion asserts that the Court "reacted with astonishment" and repeated the answer given by Det. Henderson, stating "Thrown in the garbage?! Why?!" (*Id.*) The Motion argues that this reaction indicated to the jury that the Court did not approve of Det. Hendrickson's conduct. As with the previous exchange, the transcript differs. After testifying that her files were thrown away and identifying the officer that threw away the investigate materials, the Court asked, "Just so I'm clear . . . So the plaintiff's in custody and someone throws away the investigative file?" (*Id.* at 13:13-15.) Defendant explained that the Court's understanding was correct and that she was not there at the time. (*Id.* at 13:16-22.) The Court responded, "Thank you." (*Id.*)

8

Contrary to Defendant's assertion that the Court's questioning suggested it had an opinion about Det. Hendrickson's conduct, the transcript reflects a neutral exchange with two instances of the court asking Det. Hendrickson follow-up questions. Moreover, in light of the overall evidence presented in this case, including Defendant's own acknowledgment that mistakes were made during the investigation, the court finds it unlikely that these two questions had any discernible impact on the jury's determinations. Of course, in addition to the specific language, Defendant also takes issue with the tone. So as to clarify the issue of tone, the court played recordings of the relevant exchanges in open court during the hearing. While Defendant's counsel did not reiterate the position articulated in the motion that the questions reflected a "tone of disgust," he did suggest that it sounded like the Court had an "opinion" on the matters at hand. While the question of tone is a subtle one, the Court's understanding is that these questions were asked in a neutral and measured manner. At a minimum, it does not reflect the exclamations ascribed to the Court in Defendant's brief. To the extent that the jury may have inferred anything from the Court's questioning or tone, the Court's first jury instruction included an admonition to "not read into . . . anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be." (Dkt. 125 at 2.) Ultimately, even if the Court were to find that Defendant had adequately demonstrated that the questions asked of Det. Hendrickson belied an "opinion," these two exchanges would not reflect a "pervasive climate of partiality or unfairness" or "extremely high level of interference" so as to justify a new trial. *U.S. v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982).

Defendant's second ground for seeking a new trial is that the court erroneously precluded "after-acquired incriminating evidence" despite allowing "after-acquired exculpatory evidence." (Mot. 9.) Although Defendant does not precisely state what she means by "after-acquired exculpatory evidence," it seems to be the results of the FBI subpoena indicating that Pater Noster's computer IP address originated in Austria and the fact that K.W. failed to make a positive identification at the February 2012 live lineup.

Notably, Defendant is not challenging the admissibility of this evidence but only arguing that she should have been allowed to present her own evidence acquired after the preparation of the warrant application indicating Plaintiff's guilt. This argument misunderstands why the IP information and lineup evidence were admissible. The IP information was data available to Defendant at the time she prepared the warrant affidavit and report. It is relevant to Plaintiff's case not because it indicates Plaintiff's innocence but because it demonstrates that Plaintiff failed to properly investigate the case before making representations to a judicial officer in the warrant application. Likewise, the evidence regarding K.W.'s inability to identify Plaintiff at the live lineup provides context for why the charges were ultimately dismissed and clarifies that Plaintiff's release was not due to any additional investigation on the part of Defendant. This evidence was not admitted to show Plaintiff's innocence but rather because they were probative of whether Defendant engaged in judicial deception and malicious prosecution.

Nonetheless, Defendant argues that she should have been allowed to contest the implication of Plaintiff's innocence by introducing evidence that Plaintiff was guilty. Specifically, Defendant sought to introduce evidence that K.W. failed to make a positive identification of Plaintiff during the live lineup because she did not understand that she was viewing suspects through a one-way glass. As a result, K.W. became scared and was unable to say anything at all. Defendant also sought to introduce evidence from K.W. and her mother's deposition, taken years later, that they would have been able to identify Plaintiff as Pater Noster. Beginning with K.W.'s reasons for failing to make an identification at the live lineup, the Court notes that the rulings on the motions in limine did not actually preclude this particular testimony. During a pre-trial hearing concerning motions in limine, the Court indicated that its tentative ruling was to grant Plaintiff's Motions in Limine Nos. 2 and 6, which sought to preclude the presentation of a case that resolved around actual guilt or innocence of Plaintiff. Specifically, Plaintiff sought to exclude testimony from K.W. and Nicole W. that, in the present day, they believed that the photos they saw in 2011 were of Plaintiff. These motions did not address whether

Defendant should be permitted to provide additional context for what transpired at the live lineup in February 2012. Moreover, even though Plaintiff's counsel examined both Det. Hendrickson and Plaintiff's defense counsel regarding the way the live lineup was conducted, Defendant's counsel never attempted to cross-examine either witness about whether any additional details would explain K.W.'s inability to make a positive identification. Nor did counsel request a sidebar to clarify whether the motions in limine would cover this line of questioning. Accordingly, Defendant cannot now seek a new trial on the basis of this unpursued line of questioning.

Turning to the deposition testimony, the Court disallowed this evidence as both irrelevant and highly prejudicial. The Court found that the evidence was irrelevant because the question in this case is not whether K.W. could have identified Plaintiff as Pater Noster at her March 2011 interview. Rather, it was whether Det. Hendrickson acted improperly in how she represented K.W.'s remarks in the report attached to the warrant application. Either the statements made in the report were an accurate reflection of her interview with K.W., and thus not instances of judicial deception, or they were misrepresentations. The fact that K.W. and her mother may purportedly believe today that they can identify Plaintiff as Pater Noster does not change what information was available to Det. Hendrickson when she prepared the warrant application or how she chose to represent that information to a judicial officer. The reliance on this evidence also belies the fact that the credibility of any such identification would be called into question given the initial flawed identification and the fact that the jury heard testimony that Pater Noster's Facebook account was active while Plaintiff was in custody. (RT Day 2 at 118:16-120:1.) Finally, the Court determined that it would be more prejudicial than probative to have a victim of a heinous crime testify in court that she believed Plaintiff was guilty given that this present-day certainty could not have been a justification for Det. Hendrickson's conduct several years prior.

### B. Damages Verdict

Having determined that there is no basis for setting aside the jury's liability determination, the Court turns to Defendant's contention that the jury verdict for $5 million in compensatory damages cannot be supported by the evidence. Defendant begins by arguing that evidence presented by Plaintiff cannot support a jury verdict for any economic losses and, thus, the jury's verdict should properly be viewed as compensating only "general, non-economic, and emotional distress damages." (Mot. 6.) As Defendant accurately notes, although Plaintiff testified about certain economic losses, there was no specific testimony or evidence about the value of these losses, and, thus, no basis for the jury to award economic damages. For example, Plaintiff testified that he lost his job working at warehouse after his arrest but provided no testimony or evidence about how much he made at his job or how long it took him to find a new job after his release. (*See* RT Day 2 at 131:9-15; *id.* at 136:10-14.) Likewise, Plaintiff testified that he lost his apartment and some possessions as a result of the arrest, but provided no valuation of what the loss of his apartment might have cost or what specific possessions he lost. (*See id.* at 136:7-9; *id.* at 136:15-19.) Given that the jury had no basis for valuing these potential economic losses, awarding any economic damages would be pure speculation.[1] Accordingly, the court is left to determine whether the evidence can support general, non-economic damages for $5 million.

Defendant also contends that $5 million verdict is so disproportionate to Plaintiffs' asserted injuries that the jury must have included some element of punitive damages when setting the compensatory damage award. This speculation about the jury's motivation, however, is unwarranted. As reflected in Jury Note 5, the jury was aware of

---

[1] The court also notes that the operative Complaint requested only general damages and "special damages for legal, medical and related expense, according to proof" but no special damages for lost earning or other economic losses. (*See* Dkt. 29 at 47.) *Cf. Noga v. Potenza*, 221 F. Supp. 2d 345, 357 (N.D.N.Y. 2002) (limiting awardable damages to general damages in request for remittitur where complaint lacked any claim for lost wages or other economic losses).

12

the distinction between compensatory and punitive damages and, indeed, it expressly asked when it should calculate the latter. (Dkt. 135.) The jury was instructed that, if there was a finding of liability, there would be an additional punitive damages phase of the trial. In accordance with that instruction, and the recommendation of both counsel, the jury returned a punitive damage verdict of $5,000 after the completion of the second phase of the trial. There is no reason for concluding that, despite expressly being instructed that there would be a punitive damages phase, the jury included a punitive element in the compensatory damages in addition to awarding punitive damages.

Although the Court does not find that the jury was improperly motivated by punitive concerns, that still leaves the question whether the evidence presented can sustain a compensatory damage award for $5 million. As a general matter, compensable injuries under section 1983 include "'impairment of reputation, . . . personal humiliation, and mental anguish and suffering.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (Harlan, J. concurring) (quoting *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 350 (1974)). Moreover, "[t]he testimony of the plaintiff alone can substantiate a jury's award of emotional distress damages." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir. 2008). Although Defendant notes that Plaintiff did not present any expert testimony regarding his emotional damages, the court is not aware of any precedent requiring such testimony. *Greisen v. Hanken*, No. 3:14-CV-1399-SI, 2017 WL 1967499, at *19 (D. Or. May 12, 2017) (rejecting argument that emotional damages verdict requires evidence from "psychologist, psychiatrist, or other mental health professional").

In terms of emotional damages testimony, Plaintiff described his experiences during his arrest and subsequent confinement. Plaintiff began by describing how two black SUVs approached him at 4:30 a.m. while he was waiting to go to work. (RT Day 2 at 131:25-132:12.) After being handcuffed, Plaintiff testified that he was told by Det. Hendrickson that he was "arrested for going on the Internet and trying to seek sex with little 12-, 13-, and 14-year-old girls." (*Id.* at 135:5-8.) Although Plaintiff tried to explain that he was the wrong person, it appeared no one believed him. (*See id.* at 135-136.) He

13

was then transferred to a jail where he testified one officer said to another, "Let's beat the shit out of him" and the other responded, "No, no, no, no. Guys like him, they don't live long in LA." (*Id.* at 136:23-137:7.) After spending a week at an L.A. County Jail, Plaintiff testified that he was transferred to Sacramento where he was held for approximately six months until February 2012. (*Id.* at 137.) While in custody, Plaintiff knew that he was facing charges that could result in a sentence of twenty years or more. (*Id.* at 138.) He also testified that he was held in protective custody to protect him from other inmates because of his charges. (*See id.* at 139:1-13.) Nonetheless, Plaintiff recalled being seriously attacked on four occasions, all related to his fellow inmates believing he was a child molester. (*See id.* at 139:14-140:14.) In addition to describing specific feelings of fear, confusion, and embarrassment, Plaintiff delivered this testimony in an emotional manner and cried during parts of it.

Taken together, this testimony, which describes spending nearly seven and a half months in custody, facing violence from fellow inmates and social stigma from others, and fearing a potential lengthy prison sentence on serious charges, speaks to considerable pain and suffering. However, calculating the maximum compensatory damage award this testimony can support is a challenging task. This calculation is made more difficult by the fact that neither Plaintiff's nor Defendant's counsel provided the jury much guidance on how to appropriately value the harms incurred by Plaintiff.[2] In conducting this analysis, the court considers damage awards granted in similar cases. Of course, "[w]hile analogies to, and comparisons with, other cases may be helpful on many types of issues, their usefulness on questions of damages is extremely limited." *Mattschei v. United States*, 600 F.2d 205, 209 (9th Cir. 1979). Indeed, as one district court has

---

[2] Defendant's counsel declined to address what damages would be appropriate if the jury found liability. Plaintiff's counsel suggested only that the initial arrest—the "being snatched off the street"—should be valued at $100,000 and that the ensuing confinement should be "much more than that." (*See* Dkt. 163 (RT Day 3) at 87:17-88:4.)

14

suggested, "one could find a case to support nearly any award of damages in nearly any amount." *Thornton v. Kaplan*, 958 F. Supp. 502, 505 (D. Colo. 1996).

In the motion for remittitur, Defendant cites to a number of section 1983 cases for false arrest where juries awarded between approximately $200,000 and $1.3 million. (*See* Mot. 7-8 (citing *Javier Morales-Hernandez v. City and County of Los Angeles, et al.*, No. BC376301 (L.A. Super. Ct. Sept. 29, 2010) (awarding $209,450 for spending three months in custody); *Alberto Gutierrez v. County of Los Angeles, et al.*, No. CV 10-04428-DDP (CWx) (C.D. Cal. Aug. 12, 2012 (awarding $457,500 for 18 months in jail); *Edmond Ovasapyan v. City of Glendale*, No. CV 08-00194-CAS (JWJ) (C.D. Cal. Feb. 25, 2009) (awarding $1.3 million for eight months on a murder charge)).) Plaintiff argues that these cases are all distinguishable because the plaintiffs were accused of crimes that carry less stigma, faced shorter sentences, or were not assaulted in jail. Instead, Plaintiff contends that a more analogous case is *Shipp v. DEA*, No. CV 01-00167-DOC (AN) (C.D. Cal. 2003), where the plaintiff spent 43 days in jail, was accused of a serious crime and faced a similarly lengthy sentence, and was also beaten in jail. In that case, the judge awarded plaintiff $550,000 in non-economic damages or nearly $12,800 per day of custody after a bench trial. *Id.* Extrapolated to this case, Plaintiff argues that *Shipp* would justify a fee award of nearly $3 million.

In the reply brief, and during the hearing, Defendant settles on a benchmark award of $1 million per year. In support, Defendant collects cases from numerous jurisdictions and argues that a wide range of courts have settled on $1 million per year as fair compensation for wrongful incarceration. (Reply 2-3 (collecting cases).) By that measure, Defendant contends that an award of $583,333.33 for seven months incarceration would be reasonable. In response, Plaintiff urges the court to consider the order in *Smith v. City of Oakland*, 538 F. Supp. 2d 1217 (N.D. Cal. 2008.) In *Smith*, the district court distinguished the City of Oakland's efforts to invoke a $1 million benchmark in a false arrest case because one of the leading cases discussing that sum, *Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007), established that "a

15

1  wrongfully imprisoned plaintiff was entitled to compensation of '*at least* $1 million per
2  year of imprisonment.'" *Smith*, 538 F. Supp. 2d at 1242 (quoting *Limone*, 497 F.Supp.2d at
3  243–44 (emphasis added)). Thus, in that court's view, *Limone* described a floor rather than
4  a ceiling. *Id.* The order went on to explain that "[w]here the period of incarceration is
5  shorter (e.g., less than one year), proportionately larger awards (measured by
6  annualizing the award) have been rendered, presumably reflecting Limone's observation
7  that the injury from incarceration may be more intense towards the beginning." *Id.*
8  Ultimately, in *Smith*, the court remitted a $5 million emotional distress award to $3
9  million for a 4 ½ month period of incarceration. *Id.* at 1243.

Taken together, it is evident that Plaintiff's arrest and his experience in custody were serious. Plaintiff's particular circumstances were made worse by the fact that he was accused of a disturbing crime that exposed him to physical danger while in custody and ongoing social stigma after his release. At the same time, the jury's award of $5 million for 7 ½ months of confinement, which represents an annualized award of $8 million, goes beyond most of the cases the court has reviewed. Although each case and each plaintiff is unique, the closest analogue may be *Smith*. In *Smith*, the Plaintiff alleged that the police planted a rifle on him and charged him with unlawful gun possession. *Id.* at 1240. The plaintiff in Smith described a harrowing experience, which included being arrested while lying naked in bed by a swarm of armed police. *Id.* Smith also testified about how he was interrogated at gunpoint and paraded out to a patrol car in front of his family and neighbors. *Id.* Smith provided testimony about how he had never been charged for a crime as an adult, how officers lied at various proceedings, including a parole revocation hearing, and how afraid and confused he was during the entire ordeal. *Id.* at 1241. Finally, Smith testified about the ongoing consequences of the deterioration of his relationship with his family and girlfriend. *Id.* By contrast, the transcript of Plaintiff's testimony provides a narrative account of his detention but none of the same details about particular emotional damages suffered, beyond the initial fear and confusion of his arrest, or any ongoing emotional distress. Moreover, Defendant's counsel introduced

16

some evidence about how Plaintiff had previously spent approximately six years in prison on three felony charges. (RT Day 2 at 3-19.)

Considered holistically, the situations Smith and Plaintiff faced were largely comparable. Each was confronted with serious felony charges as a result of police misconduct. Admittedly, the plaintiff in this case was held in confinement for a longer period of time and faced violence while in confinement that Smith did not. But Smith testified in much greater detail about the emotional impact of his arrest, confinement, and its lingering consequences. There is no question both of these individuals suffered considerably. However, just as the district court in *Smith* found that the jury's $5 million compensatory damage award was grossly excessive and could not be supported by the evidence, this Court finds that a similar conclusion holds in this case. Reviewing the evidence presented by Plaintiff, and taking into account Plaintiff's particular circumstances and the specific testimony he provided, the court finds that the "maximum amount sustainable by the proof," *Oracle Corp. v. SAP AG*, 765 F.3d at 1094, is a damage award for $3,000,000.00.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Remittitur is GRANTED. The award of damages is remitted from $5,000,000 to $3,000,000. Plaintiff shall have ten days from the date of this Order to accept or reject the remittitur. Should Plaintiff accept, a final judgment shall issue. Should Plaintiff reject the remittitur, the Court shall grant Defendants' Motion for a New Trial in the Alternative on the issue of damages only.

**IT IS SO ORDERED.**

Dated: June 12, 2017

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE

17