O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.N., | ) Case No. 2-14-cv-02428-DDP (PLAx) |
| | ) |
| Plaintiff, | ) **AMENDED ORDER GRANTING DEFENDANTS'** |
| | ) **MOTION FOR REMITTITUR** |
| v. | ) |
| | ) [Dkt. 147] |
| DET. HEATHER M. HENDRICKSON, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Presently before the Court is Defendant Heather M. Hendrickson's Motion for New Trial, or, in the Alternative, Request for Remittitur. After reviewing the parties' submissions and hearing oral argument, the Court adopts the following Order.

**I. BACKGROUND**

Plaintiff J.N. filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his Fourth and Fourteenth Amendment Rights on the basis of judicial deception and malicious prosecution by Defendant Det. Heather Hendrickson. (*See* Third Amended Complaint.) The facts, as presented at trial, are as follows.

In late March 2011, the Sacramento Police Department received a report from Nicole W. that her 12-year-old daughter, K.W., had been the victim of internet sex crimes. During the preceding months, K.W. had been contacted on Facebook by a man with the name "Pater Noster." Pater Noster spoke to K.W. through text and video chats. During these conversations, Pater Noster victimized K.W. by exposing himself, performing lewd acts while she was on a video chat, and encouraging her to undress for him on video.

On approximately March 31, 2011, Det. Hendrickson was assigned to the case by the Sacramento Police Department. Det. Hendrickson began her investigation by searching for the name "Pater Noster" in a California mugshot database. Det. Hendrickson got one result from her search: a man named John Noster who had, at times, gone by the alias "John Pater." Based on this result, Det. Hendrickson prepared a "six-pack"—an array of six photographs, which included John Noster's photograph at position number three. Det. Hendrickson then conducted a video-recorded interview of K.W. During the interview, Det. Hendrickson asked K.W. about her encounters with Pater Noster. Det. Hendrickson then delivered a series of admonishments and proceeded to show K.W. the six-pack. Specifically, Det. Hendrickson said, "I think we found a picture of the guy who we think might be the person . . . I want to show it to you and see if it is, okay?" She followed up by noting, "If the person that you saw is not in that series of photographs, then tell me, okay . . . We don't want to be going after the wrong guy. So if he's in there, excellent. If he's not, we need to know that too." K.W. proceeded to look at the photographs. She pointed at one picture and said, "He's too dark." K.W. then pointed at photograph number 3 (John Noster's photograph) and said, "He is too skinny, the guy I saw was much chunkier." After a few seconds, K.W. returned to photograph number 3 and said, "That kind of looks like him. . . . The rest of them don't even look close to him." Based on this statement, Det. Hendrickson directed K.W. to circle photograph number 3.

After this interview, Det. Hendrickson spoke with an agent from Federal Bureau of Investigation, Special Agent Schofield. According Schofield, who testified at trial, Det.

2

1  Hendrickson discussed Pater Noster's activities with the FBI and was told that the FBI
2  would issue a subpoena to Facebook for Pater Noster's account information. At trial, Det.
3  Hendrickson stated that she did not follow up with the FBI for the results of the
4  subpoena and was not aware until approximately January or February 2012 that the
5  subpoena results indicated that Pater Noster had logged into Facebook from a computer
6  with an IP address originating in Vienna, Austria.

7  Over the next few months, Det. Hendrickson continued the investigation by
8  communicating with Pater Noster over Facebook using K.W.'s computer and account.
9  She also reached out to the Los Angeles Police Department for assistance because her
10 primary suspect, John Noster, lived in the Los Angeles area. In August 2011, Det.
11 Hendrickson received word that the Los Angeles Police Department was prepared to
12 assist in the case. Det. Hendrickson prepared a search and arrest warrant for John Noster,
13 which she then presented to a judge. According to Plaintiff, the report Det. Hendrickson
14 attached to the warrant application contained a number of inaccuracies and gave rise to
15 his claims for judicial deception and malicious prosecution. First, the report omitted the
16 fact that Det. Hendrickson may have tainted the six-pack identification by indicating to
17 K.W. that she thought she "found a picture of the guy" before showing the photo array.
18 Second, the report did not accurately reflect K.W.'s remarks during the photo
19 identification. During the interview, K.W. affirmatively states that the man depicted in
20 photograph number 3 "is too skinny" and only later says that "[he] kind of looks like
21 him." By contrast, the report states that "Victim W. stated that # 3 (Suspect Noster)
22 looked like the person she knew as "Pater." Third, Plaintiff argued that the report
23 confusingly switched between the names "Pater Noster" and "Suspect Noster" in a
24 manner that indicated Det. Hendrickson had actually communicated with John Noster
25 (Suspect Noster) on Facebook rather than a man who used the name "Pater Noster"
26 online. Fourth, the report did not indicate that Det. Hendrickson requested an IP lookup
27 or report the results of the IP search, which would have shown that Pater Noster's
28 computer IP address originated in Austria.

3

1 The warrant was approved and, on August 17, 2011, Det. Hendrickson and LAPD executed the warrant and arrested Plaintiff while he was waiting outside his apartment for the bus to work. Plaintiff testified that he was confused and fearful during his arrest. Plaintiff remained in detention for approximately eight months. At his initial booking, Plaintiff recalls a person calling out to another officer that he was accused of raping a young child and that they should "beat the shit out of him." While detained, Plaintiff was held in protective custody because of his status as a suspected sex crime offender. During his time in jail, Plaintiff reported being assaulted by fellow inmates on four occasions because of the crimes he was accused of committing.

While Plaintiff remained in custody, additional developments occurred in the case. In September 2011, a district attorney working on the case reached out to Det. Hendrickson to inquire about the strength of the case, noting there was reason to think this might be the wrong person. In October 2011, Det. Hendrickson learned that the computers seized from Plaintiff's home contained no evidence indicating he was Pater Noster. In December 2011, Plaintiff's defense counsel informed the district attorney's office that he had confirmed "Pater Noster" was still active on Facebook. During this time, the district attorney assigned to the case reached out to Det. Hendrickson indicating concerns about the strength of the case and requesting further updates but received no response. In January 2012, Plaintiff's defense counsel was able to view the recorded interview of K.W. for the first time. He shared that video with the district attorney, raised concerns about the tainted identification, and asked for the charges to be dropped. In early February 2012, a live lineup was conducted. but K.W. was unable to identify Plaintiff at the lineup. On February 15, 2012, the District Attorney dismissed the case for insufficient evidence. Due to Plaintiff's prior convictions, none of which were for sex crimes, he was transferred to federal custody and not actually released until April 3, 2012.

During trial, defense counsel acknowledged a number of the key facts and that "mistakes were made" during the investigation. Nonetheless, counsel urged a defense

1 verdict on the ground that the negligence in this case did not rise to the level of judicial
2 deception or malicious prosecution. After a four-day trial, the jury returned a verdict
3 finding Det. Hendrickson liable on both causes of action. The jury awarded $5,000,000 in
4 compensatory damages and $5,000 in punitive damages. (Dkts. 136, 138.) Judgment was
5 entered on March 28, 2017. (Dkt. 143.)

6 Defendant now moves for an order granting a new trial or, in the alternative, a
7 remittitur of the jury's award for damages.

**II. LEGAL STANDARD**

9 Federal Rule of Civil Procedure 59 governs motions for a new trial. Pursuant to
10 Rule 59(a)(1), "[t]he court may, on motion, grant a new trial on all or some of the issues
11 . . . after a jury trial, for any reason for which a new trial has heretofore been granted in
12 an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although Rule 59 does not
13 enumerate specific grounds for a new trial, the Ninth Circuit has held that "'the trial
14 court may grant a new trial only if the verdict is contrary to the clear weight of the
15 evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of
16 justice.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v.*
17 *Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)) (brackets
18 omitted). A miscarriage of justice can occur where there is prejudicial misconduct from
19 opposing counsel or where legal error was unduly prejudicial to the opposing party. A
20 district court "enjoys considerable discretion in granting or denying the motion."
21 *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003).

22 When the movant claims that a verdict was against the clear weight of the
23 evidence at trial, a new trial should be granted "[i]f, having given full respect to the jury's
24 findings, the judge . . . is left with the definite and firm conviction that a mistake has been
25 committed." *Landes Const. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir.
26 1987). A "jury's verdict must be upheld if it is supported by substantial evidence, which
27 is evidence adequate to support the jury's conclusion, even if it is also possible to draw a
28 contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

When a court determines that a damages award is excessive, it may grant a defendant's motion for a new trial or conditionally deny the motion, provided the plaintiff accepts a remittitur. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983); Fed. R. Civ. P. 59(a)(1)(A). The remittitur, or reduced damage award, "must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081. 1094 (9th Cir. 2014) (internal quotation and citation omitted). The plaintiff may choose either to accept the reduced damage award or to submit to a new trial. *Fenner*, 716 F.2d at 603.

**III. DISCUSSION**

Defendant's Motion presents three grounds for ordering a new trial or, in the alternative, granting a remittitur. First, Defendant argues that the jury's award of $5 million in compensatory damages was excessive and against the weight of the evidence. (Mot. 3.) Next, Defendant argues that the Court's examination of Det. Hendrickson was highly prejudicial. (*Id.*) Finally, Defendant contends that the Court erroneously "precluded after-acquired incriminating evidence" despite allowing "after-acquired exculpatory evidence."(*Id.*) In her reply brief, Defendant only addresses the argument that the jury verdict was excessive. Although Defendant may have abandoned the remaining two issues, the court nonetheless addresses them out of an abundance of caution before turning to whether the evidence supported the compensatory damage award.

**A. Grounds for New Trial**

The Court begins with Defendant's contention that Det. Hendrickson was asked questions by the Court on two occasions in a "highly prejudicial" manner. The first was regarding Det. Hendrickson's testimony about admonitions she delivered to K.W. prior to showing the six-pack and the second was regarding the fact that the investigative files in this case were thrown away after Det. Hendrickson was reassigned from the case.

Federal Rule of Evidence 614 provides district courts broad discretion to question witnesses. *See* Fed. R. Evid. 614. The Ninth Circuit has explained, "It is entirely proper for

1  [the trial judge] to participate in the examination of witnesses for the purpose of
2  clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly
3  presentation of the evidence, and preventing undue repetition of testimony[.]" *Swinton v.*
4  *Potomac Corp.*, 270 F.3d 794, 808 (9th Cir.2001) (internal quotation marks and citation
5  omitted). A judge, however, "must not adopt a partisan stance." *United States v. Medina-*
6  *Verdugo*, 637 F.2d 649, 653 (9th Cir. 1980). FRE 614(c) provides that "[a] party may object
7  to the court's . . . examining a witness either at that time or at the next opportunity when
8  the jury is not present." Fed. R. Evid. 614(c).

9  Plaintiff contends Defendant is barred from objecting to the Court's examination
10 of Det. Hendrickson because of the failure to object either at the time of the questioning
11 or the "next opportunity when the jury is not present." (*See* Opp'n 20.) Although neither
12 side has identified Ninth Circuit authority on the consequences of failing to timely raise a
13 FRE 614 objection, other courts of appeals have held that such a failure precludes later
14 review. *See Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) ("If a party
15 fails to object to the court's interrogation of a witness at trial, his objection will not be
16 reviewed on appeal."); *See United States v. Vega*, 589 F.2d 1147, 1152-53 (2d Cir. 1978)
17 (same); *Faudree v. Iron City Sand & Gravel Co.*, 315 F.2d 647, 651–52 (3d Cir. 1963); *Vergott*
18 *v. Deseret Pharmaceutical Co.*, 463 F.2d 12, 17 (5th Cir. 1972); *see also Hanson v. Waller*, 888
19 F.2d 806, 813 (11th Cir. 1989) (holding that failure to timely object is deemed waiver
20 unless the examination constitutes plain error); *United States v. Hickman*, 592 F.2d 931, 936
21 (6th Cir. 1979) (subjecting court's questioning to plain error review despite counsel's
22 failure to timely object). In light of Defendant's failure to object at any point during the
23 trial, the court deems the objection waived and concludes that it does not justify ordering
24 a new trial.

25 Assuming, however, that the failure to object is excusable, the court would
26 nonetheless find the argument unavailing on the merits. First, while the court recognizes
27 that Defendant had to prepare the instant motion without the benefit of the transcript, a
28 review of the relevant excerpts demonstrates that the Motion does not accurately

7

1 represent the exchanges at issue. According to the Motion, when Det. Hendrickson
2 testified that she told K.W. "if you see him (Pater Noster) here, great, if not, we need to
3 know that too," the Court purportedly responded by "incredulously ask[ing] Detective
4 Hendrickson, 'why would you say that?'" (Mot. 9.) The Motion goes on to contend that
5 "the tone and disgust" of the Court's questioning made it "abundantly clear" to the jury
6 that the Court felt Det. Hendrickson's comment was inappropriate. (*Id*.) The transcript,
7 however, reflects a different exchange. The excerpt begins with Det. Hendrickson
8 testifying that she told K.W., "If he's in here, excellent. If he's not, we need to know that
9 too so we don't head in the wrong direction." (Dkt. 160 (Reporter's Transcript ("RT")) 
10 Day 2 at 33:2-4.). After that answer, the Court asked: "What does that mean 'if he's in
11 here, excellent'? What are you communicating to the child at that point, 'If he's in here,
12 excellent'?" (*Id.* at 33:5-7.) Det. Hendrickson answered that she "was trying to put it in –
13 in words that a 12-year-old would understand." (*Id.* at 33:8-9.) The Court responded
14 "Okay." (*Id.* at 33:11.) Det. Hendrickson then followed up with additional clarification
15 and the Court said, "Thank you." (*Id.* at 33:12-18.)

16       The second occasion raised by the motion was Det. Hendrickson's testimony that
17 her investigative files were thrown away after she was reassigned from detective to
18 patrol officer during the investigation. (*Id.*) The Motion asserts that the Court "reacted
19 with astonishment" and repeated the answer given by Det. Henderson, stating "Thrown
20 in the garbage?! Why?!" (*Id.*) The Motion argues that this reaction indicated to the jury
21 that the Court did not approve of Det. Hendrickson's conduct. As with the previous
22 exchange, the transcript differs. After testifying that her files were thrown away and
23 identifying the officer that threw away the investigate materials, the Court asked, "Just so
24 I'm clear . . . So the plaintiff's in custody and someone throws away the investigative
25 file?" (*Id.* at 13:13-15.) Defendant explained that the Court's understanding was correct
26 and that she was not there at the time. (*Id.* at 13:16-22.) The Court responded, "Thank
27 you." (*Id.*)

28

1      Contrary to Defendant's assertion that the Court's questioning suggested it had an
2   opinion about Det. Hendrickson's conduct, the transcript reflects a neutral exchange with
3   two instances of the court asking Det. Hendrickson follow-up questions. Moreover, in
4   light of the overall evidence presented in this case, including Defendant's own
5   acknowledgment that mistakes were made during the investigation, the court finds it
6   unlikely that these two questions had any discernible impact on the jury's
7   determinations. Of course, in addition to the specific language, Defendant also takes
8   issue with the tone. So as to clarify the issue of tone, the court played recordings of the
9   relevant exchanges in open court during the hearing. While Defendant's counsel did not
10  reiterate the position articulated in the motion that the questions reflected a "tone of
11  disgust," he did suggest that it sounded like the Court had an "opinion" on the matters
12  at hand. While the question of tone is a subtle one, the Court's understanding is that
13  these questions were asked in a neutral and measured manner. At a minimum, it does
14  not reflect the exclamations ascribed to the Court in Defendant's brief. To the extent that
15  the jury may have inferred anything from the Court's questioning or tone, the Court's
16  first jury instruction included an admonition to "not read into . . . anything that I may say
17  or do or have said or done that I have an opinion regarding the evidence or what your
18  verdict should be." (Dkt. 125 at 2.) Ultimately, even if the Court were to find that
19  Defendant had adequately demonstrated that the questions asked of Det. Hendrickson
20  belied an "opinion," these two exchanges would not reflect a "pervasive climate of
21  partiality or unfairness" or "extremely high level of interference" so as to justify a new
22  trial. *U.S. v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982).
23      Defendant's second ground for seeking a new trial is that the court erroneously
24  precluded "after-acquired incriminating evidence" despite allowing "after-acquired
25  exculpatory evidence." (Mot. 9.) Although Defendant does not precisely state what she
26  means by "after-acquired exculpatory evidence," it seems to be the results of the FBI
27  subpoena indicating that Pater Noster's computer IP address originated in Austria and
28  the fact that K.W. failed to make a positive identification at the February 2012 live lineup.

1  Notably, Defendant is not challenging the admissibility of this evidence but only arguing
2  that she should have been allowed to present her own evidence acquired after the
3  preparation of the warrant application indicating Plaintiff's guilt. This argument
4  misunderstands why the IP information and lineup evidence were admissible. The IP
5  information was data available to Defendant at the time she prepared the warrant
6  affidavit and report. It is relevant to Plaintiff's case not because it indicates Plaintiff's
7  innocence but because it demonstrates that Plaintiff failed to properly investigate the case
8  before making representations to a judicial officer in the warrant application. Likewise,
9  the evidence regarding K.W.'s inability to identify Plaintiff at the live lineup provides
10 context for why the charges were ultimately dismissed and clarifies that Plaintiff's release
11 was not due to any additional investigation on the part of Defendant. This evidence was
12 not admitted to show Plaintiff's innocence but rather because they were probative of
13 whether Defendant engaged in judicial deception and malicious prosecution.
14         Nonetheless, Defendant argues that she should have been allowed to contest the
15 implication of Plaintiff's innocence by introducing evidence that Plaintiff was guilty.
16 Specifically, Defendant sought to introduce evidence that K.W. failed to make a positive
17 identification of Plaintiff during the live lineup because she did not understand that she
18 was viewing suspects through a one-way glass. As a result, K.W. became scared and was
19 unable to say anything at all. Defendant also sought to introduce evidence from K.W.
20 and her mother's deposition, taken years later, that they would have been able to identify
21 Plaintiff as Pater Noster. Beginning with K.W.'s reasons for failing to make an
22 identification at the live lineup, the Court notes that the rulings on the motions in limine
23 did not actually preclude this particular testimony. During a pre-trial hearing concerning
24 motions in limine, the Court indicated that its tentative ruling was to grant Plaintiff's
25 Motions in Limine Nos. 2 and 6, which sought to preclude the presentation of a case that
26 resolved around actual guilt or innocence of Plaintiff. Specifically, Plaintiff sought to
27 exclude testimony from K.W. and Nicole W. that, in the present day, they believed that
28 the photos they saw in 2011 were of Plaintiff. These motions did not address whether

Defendant should be permitted to provide additional context for what transpired at the live lineup in February 2012. Moreover, even though Plaintiff's counsel examined both Det. Hendrickson and Plaintiff's defense counsel regarding the way the live lineup was conducted, Defendant's counsel never attempted to cross-examine either witness about whether any additional details would explain K.W.'s inability to make a positive identification. Nor did counsel request a sidebar to clarify whether the motions in limine would cover this line of questioning. Accordingly, Defendant cannot now seek a new trial on the basis of this unpursued line of questioning.

Turning to the deposition testimony, the Court disallowed this evidence as both irrelevant and highly prejudicial. The Court found that the evidence was irrelevant because the question in this case is not whether K.W. could have identified Plaintiff as Pater Noster at her March 2011 interview. Rather, it was whether Det. Hendrickson acted improperly in how she represented K.W.'s remarks in the report attached to the warrant application. Either the statements made in the report were an accurate reflection of her interview with K.W., and thus not instances of judicial deception, or they were misrepresentations. The fact that K.W. and her mother may purportedly believe today that they can identify Plaintiff as Pater Noster does not change what information was available to Det. Hendrickson when she prepared the warrant application or how she chose to represent that information to a judicial officer. The reliance on this evidence also belies the fact that the credibility of any such identification would be called into question given the initial flawed identification and the fact that the jury heard testimony that Pater Noster's Facebook account was active while Plaintiff was in custody. (RT Day 2 at 118:16-120:1.) Finally, the Court determined that it would be more prejudicial than probative to have a victim of a heinous crime testify in court that she believed Plaintiff was guilty given that this present-day certainty could not have been a justification for Det. Hendrickson's conduct several years prior.

**B. Damages Verdict**

Having determined that there is no basis for setting aside the jury's liability determination, the Court turns to Defendant's contention that the jury verdict for $5 million in compensatory damages cannot be supported by the evidence. Defendant begins by arguing that evidence presented by Plaintiff cannot support a jury verdict for any economic losses and, thus, the jury's verdict should properly be viewed as compensating only "general, non-economic, and emotional distress damages." (Mot. 6.) As Defendant accurately notes, although Plaintiff testified about certain economic losses, there was no specific testimony or evidence about the value of these losses, and, thus, no basis for the jury to award economic damages. For example, Plaintiff testified that he lost his job working at warehouse after his arrest but provided no testimony or evidence about how much he made at his job or how long it took him to find a new job after his release. (*See* RT Day 2 at 131:9-15; *id.* at 136:10-14.) Likewise, Plaintiff testified that he lost his apartment and some possessions as a result of the arrest, but provided no valuation of what the loss of his apartment might have cost or what specific possessions he lost. (*See id.* at 136:7-9; *id.* at 136:15-19.) Given that the jury had no basis for valuing these potential economic losses, awarding any economic damages would be pure speculation.[1] Accordingly, the court is left to determine whether the evidence can support general, non-economic damages for $5 million.

Defendant also contends that $5 million verdict is so disproportionate to Plaintiffs' asserted injuries that the jury must have included some element of punitive damages when setting the compensatory damage award. This speculation about the jury's motivation, however, is unwarranted. As reflected in Jury Note 5, the jury was aware of

---

[1] The court also notes that the operative Complaint requested only general damages and "special damages for legal, medical and related expense, according to proof" but no special damages for lost earning or other economic losses. (*See* Dkt. 29 at 47.) *Cf. Noga v. Potenza*, 221 F. Supp. 2d 345, 357 (N.D.N.Y. 2002) (limiting awardable damages to general damages in request for remittitur where complaint lacked any claim for lost wages or other economic losses).

12

1 the distinction between compensatory and punitive damages and, indeed, it expressly
2 asked when it should calculate the latter. (Dkt. 135.) The jury was instructed that, if there
3 was a finding of liability, there would be an additional punitive damages phase of the
4 trial. In accordance with that instruction, and the recommendation of both counsel, the
5 jury returned a punitive damage verdict of $5,000 after the completion of the second
6 phase of the trial. There is no reason for concluding that, despite expressly being
7 instructed that there would be a punitive damages phase, the jury included a punitive
8 element in the compensatory damages in addition to awarding punitive damages.

9 Although the Court does not find that the jury was improperly motivated by
10 punitive concerns, that still leaves the question whether the evidence presented can
11 sustain a compensatory damage award for $5 million. As a general matter, compensable
12 injuries under section 1983 include "'impairment of reputation, . . . personal humiliation,
13 and mental anguish and suffering.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299,
14 307 (1986) (Harlan, J. concurring) (quoting *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 350
15 (1974)). Moreover, "[t]he testimony of the plaintiff alone can substantiate a jury's award
16 of emotional distress damages." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir.
17 2008). Although Defendant notes that Plaintiff did not present any expert testimony
18 regarding his emotional damages, the court is not aware of any precedent requiring such
19 testimony. *Greisen v. Hanken*, No. 3:14-CV-1399-SI, 2017 WL 1967499, at *19 (D. Or. May
20 12, 2017) (rejecting argument that emotional damages verdict requires evidence from
21 "psychologist, psychiatrist, or other mental health professional").

22 In terms of emotional damages testimony, Plaintiff described his experiences
23 during his arrest and subsequent confinement. Plaintiff began by describing how two
24 black SUVs approached him at 4:30 a.m. while he was waiting to go to work. (RT Day 2
25 at 131:25-132:12.) After being handcuffed, Plaintiff testified that he was told by Det.
26 Hendrickson that he was "arrested for going on the Internet and trying to seek sex with
27 little 12-, 13-, and 14-year-old girls." (*Id.* at 135:5-8.) Although Plaintiff tried to explain
28 that he was the wrong person, it appeared no one believed him. (*See id.* at 135-136.) He

13

was then transferred to a jail where he testified one officer said to another, "Let's beat the shit out of him" and the other responded, "No, no, no, no. Guys like him, they don't live long in LA." (*Id.* at 136:23-137:7.) After spending a week at an L.A. County Jail, Plaintiff testified that he was transferred to Sacramento where he was held for approximately six months until February 2012. (*Id.* at 137.) While in custody, Plaintiff knew that he was facing charges that could result in a sentence of twenty years or more. (*Id.* at 138.) He also testified that he was held in protective custody to protect him from other inmates because of his charges. (*See id.* at 139:1-13.) Nonetheless, Plaintiff recalled being seriously attacked on four occasions, all related to his fellow inmates believing he was a child molester. (*See id.* at 139:14-140:14.) In addition to describing specific feelings of fear, confusion, and embarrassment, Plaintiff delivered this testimony in an emotional manner and cried during parts of it.

Taken together, this testimony, which describes spending nearly seven and a half months in custody, facing violence from fellow inmates and social stigma from others, and fearing a potential lengthy prison sentence on serious charges, speaks to considerable pain and suffering. However, calculating the maximum compensatory damage award this testimony can support is a challenging task. This calculation is made more difficult by the fact that neither Plaintiff's nor Defendant's counsel provided the jury much guidance on how to appropriately value the harms incurred by Plaintiff.[2] In conducting this analysis, the court considers damage awards granted in similar cases. Of course, "[w]hile analogies to, and comparisons with, other cases may be helpful on many types of issues, their usefulness on questions of damages is extremely limited." *Mattschei v. United States*, 600 F.2d 205, 209 (9th Cir. 1979). Indeed, as one district court has

---

[2] Defendant's counsel declined to address what damages would be appropriate if the jury found liability. Plaintiff's counsel suggested only that the initial arrest—the "being snatched off the street"—should be valued at $100,000 and that the ensuing confinement should be "much more than that." (*See* Dkt. 163 (RT Day 3) at 87:17-88:4.)

14

1  suggested, "one could find a case to support nearly any award of damages in nearly any
2  amount." *Thornton v. Kaplan*, 958 F. Supp. 502, 505 (D. Colo. 1996).

3  In the motion for remittitur, Defendant cites to a number of section 1983 cases for
4  false arrest where juries awarded between approximately $200,000 and $1.3 million. (*See*
5  Mot. 7-8 (citing *Javier Morales-Hernandez v. City and County of Los Angeles, et al.*, No.
6  BC376301 (L.A. Super. Ct. Sept. 29, 2010) (awarding $209,450 for spending three months
7  in custody); *Alberto Gutierrez v. County of Los Angeles, et al.*, No. CV 10-04428-DDP (CWx)
8  (C.D. Cal. Aug. 12, 2012 (awarding $457,500 for 18 months in jail); *Edmond Ovasapyan v.*
9  *City of Glendale*, No. CV 08-00194-CAS (JWJ) (C.D. Cal. Feb. 25, 2009) (awarding $1.3
10 million for eight months on a murder charge)).) Plaintiff argues that these cases are all
11 distinguishable because the plaintiffs were accused of crimes that carry less stigma, faced
12 shorter sentences, or were not assaulted in jail. Instead, Plaintiff contends that a more
13 analogous case is *Shipp v. DEA*, No. CV 01-00167-DOC (AN) (C.D. Cal. 2003), where the
14 plaintiff spent 43 days in jail, was accused of a serious crime and faced a similarly
15 lengthy sentence, and was also beaten in jail. In that case, the judge awarded plaintiff
16 $550,000 in non-economic damages or nearly $12,800 per day of custody after a bench
17 trial. *Id.* Extrapolated to this case, Plaintiff argues that *Shipp* would justify a fee award of
18 nearly $3 million.

19 In the reply brief, and during the hearing, Defendant settles on a benchmark
20 award of $1 million per year. In support, Defendant collects cases from numerous
21 jurisdictions and argues that a wide range of courts have settled on $1 million per year as
22 fair compensation for wrongful incarceration. (Reply 2-3 (collecting cases).) By that
23 measure, Defendant contends that an award of $583,333.33 for seven months
24 incarceration would be reasonable. In response, Plaintiff urges the court to consider the
25 order in *Smith v. City of Oakland*, 538 F. Supp. 2d 1217 (N.D. Cal. 2008.) In *Smith*, the
26 district court distinguished the City of Oakland's efforts to invoke a $1 million
27 benchmark in a false arrest case because one of the leading cases discussing that sum,
28 *Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007), established that "a

15

1  wrongfully imprisoned plaintiff was entitled to compensation of '*at least* $1 million per
2  year of imprisonment.'" *Smith*, 538 F. Supp. 2d at 1242 (quoting *Limone*, 497 F.Supp.2d at
3  243–44 (emphasis added)). Thus, in that court's view, *Limone* described a floor rather than
4  a ceiling. *Id*. The order went on to explain that "[w]here the period of incarceration is
5  shorter (e.g., less than one year), proportionately larger awards (measured by
6  annualizing the award) have been rendered, presumably reflecting Limone's observation
7  that the injury from incarceration may be more intense towards the beginning." *Id*.
8  Ultimately, in *Smith*, the court remitted a $5 million emotional distress award to $3
9  million for a 4 ½ month period of incarceration. *Id*. at 1243.
10        Taken together, it is evident that Plaintiff's arrest and his experience in custody
11  were serious. Plaintiff's particular circumstances were made worse by the fact that he
12  was accused of a disturbing crime that exposed him to physical danger while in custody
13  and ongoing social stigma after his release. At the same time, the jury's award of $5
14  million for 7 ½ months of confinement, which represents an annualized award of $8
15  million, goes beyond most of the cases the court has reviewed. Although each case and
16  each plaintiff is unique, the closest analogue may be *Smith*. In *Smith*, the Plaintiff alleged
17  that the police planted a rifle on him and charged him with unlawful gun possession. *Id*.
18  at 1240. The plaintiff in Smith described a harrowing experience, which included being
19  arrested while lying naked in bed by a swarm of armed police. *Id*. Smith also testified
20  about how he was interrogated at gunpoint and paraded out to a patrol car in front of his
21  family and neighbors. *Id*. Smith provided testimony about how he had never been
22  charged for a crime as an adult, how officers lied at various proceedings, including a
23  parole revocation hearing, and how afraid and confused he was during the entire ordeal.
24  *Id*. at 1241. Finally, Smith testified about the ongoing consequences of the deterioration of
25  his relationship with his family and girlfriend. *Id*. By contrast, the transcript of Plaintiff's
26  testimony provides a narrative account of his detention but none of the same details
27  about particular emotional damages suffered, beyond the initial fear and confusion of his
28  arrest, or any ongoing emotional distress. Moreover, Defendant's counsel introduced

some evidence about how Plaintiff had previously spent approximately six years in prison on three felony charges. (RT Day 2 at 3-19.)

Considered holistically, the situations Smith and Plaintiff faced were largely comparable. Each was confronted with serious felony charges as a result of police misconduct. Admittedly, the plaintiff in this case was held in confinement for a longer period of time and faced violence while in confinement that Smith did not. But Smith testified in much greater detail about the emotional impact of his arrest, confinement, and its lingering consequences. There is no question both of these individuals suffered considerably. However, just as the district court in *Smith* found that the jury's $5 million compensatory damage award was grossly excessive and could not be supported by the evidence, this Court finds that a similar conclusion holds in this case. Reviewing the evidence presented by Plaintiff, and taking into account Plaintiff's particular circumstances and the specific testimony he provided, the court finds that the "maximum amount sustainable by the proof," *Oracle Corp. v. SAP AG*, 765 F.3d at 1094, is a damage award for $3,000,000.00.

**IV. CONCLUSION**

For the reasons stated above, Defendants' Motion for Remittitur is GRANTED. The award of damages is remitted from $5,000,000 to $3,000,000. Plaintiff shall have ten days from the date of this Order to accept or reject the remittitur. Should Plaintiff accept, a final judgment shall issue. Should Plaintiff reject the remittitur, the Court shall grant Defendants' Motion for a New Trial in the Alternative on the issue of damages only.

**IT IS SO ORDERED.**

Dated: June 12, 2017

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE